# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 19-CR-431 (JFB)

---

UNITED STATES OF AMERICA,

VERSUS

JUVENILE FEMALE,

Defendant.

---

**MEMORANDUM AND ORDER**
January 26, 2022

---

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On September 20, 2019, the government filed a Juvenile Information against defendant Juvenile Female ("the defendant"),[1] charging her with the following: one count of racketeering, 18 U.S.C. §§ 1962(c), 1963, 5032 *et seq.*; one count of racketeering conspiracy, 18 U.S.C. §§ 1962(d), 1963, 5032 *et seq.*; two counts of conspiracy to murder alleged rival gang members in aid of racketeering, 18 U.S.C. §§ 1959(a)(5), 5032 *et seq.*; one count of murder in aid of racketeering, 18 U.S.C. §§ 2, 1959(a)(1), 5032 *et seq.*; one count of brandishing and discharging a firearm during a murder, 18 U.S.C.. §§ 2, 924(c)(1)(A)(i)–(iii), 5032 *et seq.*; and one count of causing the death of another individual through use of a firearm, 18 U.S.C. § 2, 924(j)(1), 5032 *et*

*seq.* These charges relate to the defendant's alleged participation, as an associate of La Mara Salvatrucha, a violent street gang also known as MS-13, in a conspiracy to murder two juveniles—John Doe #1 and Jasson Medrano-Molina—between July 2019 and August 2019, as well as the murder of Medrano-Molina on August 7, 2019, in a wooded area behind a temple located in Central Islip, New York.

Before the Court is the government's motion under 18 U.S.C. § 5032 to transfer the case to district court in order to prosecute the defendant as an adult. On December 14, 2021, after receiving written submissions from the parties, the Court held an evidentiary hearing on the motion. This Memorandum and Order contains the Court's findings under 18 U.S.C. § 5032.

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). In order to comply with this provision and Section 5038's other requirements regarding the confidentiality of juvenile records, the Court has determined that these proceedings and all related documents should be sealed.

As discussed in great detail below, after carefully analyzing the required statutory factors, the Court concludes in its discretion that the government in this case has rebutted the statutory presumption in favor of juvenile adjudication, and met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

First, the nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult. As detailed below, the defendant is charged, *inter alia*, with actively participating in a conspiracy to murder two fifteen-year-old alleged rival gang members, and with participating in the murder of one of those individuals (Medrano-Molina), in aid of the MS-13 gang. More specifically, the defendant is alleged to have engaged in the following conduct with respect to the charged offenses: (1) instigating the conspiracy to murder Medrano-Molina and the other individual (John Doe #1) by informing her ex-boyfriend, a member of MS-13, that these individuals were, among other persons, members of the rival 18th Street gang; (2) devising a plan with her ex-boyfriend and other MS-13 members to lure John Doe #1 and Medrano-Molina to a secluded area where MS-13 members were waiting to kill them; and (3) facilitating the aforementioned plan by using her friendship with Medrano-Molina to lure him to a designated location where MS-13 members were waiting to murder him, and where Medrano-Molina was then murdered. Thus, the Court finds that the extremely violent nature of the alleged murder, and the defendant's alleged active participation in the murder plan over several weeks, is entitled to special weight in this case.

The defendant's age and social background also favor transfer. The

defendant was weeks away from her seventeenth birthday when she allegedly instigated the conspiracy to murder John Doe #1 and Medrano-Molina, and just five days away from her seventeenth birthday when she allegedly participated in the murder of Medrano-Molina. She is now over eighteen years old.

As for the defendant's social background, the defendant experienced extreme physical and sexual abuse in El Salvador before coming to the United States to be with her mother, leading to the defendant's diagnosis of cannabis use disorder and complex post-traumatic stress disorder ("PTSD"). Although her mother was willing and able to provide her with a loving and supportive home when the defendant arrived in the United States, the defendant continued to feel distrust towards her mother due to her PTSD, childhood traumas, and abandonment issues. Indeed, prior to the alleged offenses and shortly before her detention, the defendant dropped out of school and left her mother's house to live with her MS-13-affiliated boyfriend. The defendant allegedly even went so far as to aid the gang by attempting to obstruct justice after the murder. In short, despite family support, her ties to the MS-13 gang, and loyalty to that gang, appear to have been very strong. Moreover, as discussed *infra*, she has never denounced the MS-13 gang, nor her association with the gang, during her rehabilitation efforts. Thus, although recognizing that the extreme abuse that she suffered in El Salvador has resulted in complex PTSD, the Court finds that her age, social background, and history with the MS-13 gang favor transferring her to adult status.

The defendant's lack of a juvenile record weighs against transfer, but as explained below, the Court finds that, in the instant case, after balancing all the statutory factors

(including this one), transfer is in the interest of justice.

Next, as for the defendant's present intellectual development and psychological maturity, the Court finds this factor to be neutral. As to her intellectual development, the defendant's transcripts from Central Islip High School and Sojourn High School (the educational program at the juvenile detention facility where the defendant is housed), both indicate strong intellectual and cognitive skills. Therefore, the defendant clearly had the intellectual functioning, as a juvenile, to understand the violent nature of the MS-13 gang, and the dire harm to others that would result from her alleged participation in the gang's conduct. Indeed, she acknowledged in her psychological examination that she had been exposed to the gang from early childhood in El-Salvador and knew that it was dangerous.

Regarding her psychological maturity, the psychological examination of the defendant, conducted by the defense expert Dr. Eric Goldsmith, indicates that she suffers from complex PTSD[2] and cannabis use disorder. Dr. Goldsmith testified that the defendant's psychological maturity has been greatly impacted by her traumas, resulting in her inability to trust others or form real emotional connections, and in her view of herself as a "monster" who victimizes others. Thus, despite strong cognitive and intellectual skills, the defendant has significant delays in developmental maturity. On balance, this factor neither favors nor disfavors transfer.

The next factor—the nature of past treatment efforts and the defendant's response to those efforts to date—weighs in favor of transfer. Although the defendant did not receive any meaningful treatment or rehabilitative efforts prior to her incarceration on the instant charges, the treatment efforts to date do not show any likelihood that she will be successfully rehabilitated within the juvenile system. The defendant was briefly seeing a psychologist at the Essex County facility, but has refused to continue with such treatment, citing a lack of trust. She has received no other treatment for her PTSD. Additionally, the defendant has committed two disciplinary infractions during her detention: one fight and one possession of contraband items including a shank. Based upon this record, it is clear that the defendant's rehabilitation efforts are at their beginning stages, and that there are signs that she is resisting such efforts.

As for the last factor, availability of programs designed to treat the defendant's behavioral problems, there is some indication that facilities in Pennsylvania and Maine, and potentially South Dakota and Texas, would be available to the defendant if she is found guilty as a juvenile. Accordingly, this factor weighs against transfer.

Although some factors weigh against transfer, they do not outweigh the others that, in combination, overwhelmingly favor transfer. In particular, the violent and brutal nature of the alleged murder, including the defendant's alleged active participation in the murder and obstruction of justice in connection therewith, the defendant's age

---

[2] Complex PTSD is not currently recognized by the Diagnostic and Statistical Manual of Mental Disorders, but is "a source of interest in the field of psychiatry, psychology, trauma treatment." (Transfer Hearing Tr. at 18:6–14.) It typically arises in individuals like the defendant who have been exposed to severe early childhood abuse, and can lead to "a number of emotional difficulties that are in the range

of a great deal of difficulty containing anger and emotion, problems in trust and in forming relationships, and great deals of difficulties with containing their emotions to the point of exhibiting self-harm, [and] repeated suicide attempts." (*Id.* at 18:8–16.) Complex PTSD, as it exhibits in the defendant, is discussed further below.

and social background, and the fact that the defendant is only at the beginning stages of any successful rehabilitation efforts, together overwhelmingly demonstrate that transfer is warranted in the interest of justice.

As the Second Circuit has emphasized, "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) (quoting *United States v. J.D.*, 525 F. Supp. 101, 103 (S.D.N.Y. 1981)). The Sixth Circuit has similarly reasoned that "a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. T.F.F., A Juvenile Male*, 55 F.3d 1118, 1121 (6th Cir. 1995) (quoting *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir. 1994)). Here, with respect to this defendant, the Court concludes that there is no likelihood

that the goals of the juvenile system will be achieved while the defendant is in juvenile custody and, under the particular circumstances of this case, "the concerns of public protection and punishment become paramount." *Nelson*, 90 F.3d at 640. In other words, the juvenile justice system (with a statutory maximum of five years' imprisonment) is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, the defendant's alleged participation in these violent crimes when considered in conjunction with the other statutory factors.

In short, after thoroughly considering and weighing the statutory factors, the Court has determined in its discretion that treating the defendant as an adult in this case will serve the interest of justice.[3]

## I. THE CHARGES[4]

The charges against the defendant stem from the government's continuing

---

[3] This decision is consistent with others in which this Court transferred juveniles to adult status for their alleged participation in violent acts in connection with the MS-13 gang. *See, e.g., United States v. Juvenile Female*, 313 F. Supp. 412 (E.D.N.Y. 2018) (defendant was seventeen years, four months old at time of alleged brutal murder of four suspected rival gang members and/or individuals believed to have disrespected MS-13 members); *United States v. Juvenile Male*, 269 F. Supp. 3d 29 (E.D.N.Y. 2017) (defendant was sixteen years, six months old at time of alleged attempted murder of a rival gang member, and sixteen years, eleven months old at time of alleged murder of an MS-13 member suspected of cooperating with law enforcement); *United States v. Juvenile Male*, No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was seventeen years, ten months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was sixteen years, seven months old at time of alleged attempted murder of a sixteen-year-old male, and seventeen years, eight months old at time of alleged murder of another individual); *United States v.*

*Juvenile Male*, No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was seventeen years, four months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, 844 F. Supp. 2d 333 (E.D.N.Y. 2012) (defendant was sixteen years, three months old at time of alleged murder of a fifteen-year-old); *United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27 (E.D.N.Y. 2011) (defendant was sixteen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son); *United States v. Juvenile Male*, 844 F. Supp. 2d 312 (E.D.N.Y. 2011) (defendant was seventeen years, six months old at time of two alleged attempted murders); *United States v. Juvenile Male*, 754 F. Supp. 2d 569 (E.D.N.Y. 2010) (defendant was seventeen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son).

[4] The allegations set forth herein are drawn from the government's motion papers. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of

investigation into the MS-13 gang. (Gov't. Mem. at 2.) Since approximately 1998, MS-13 members on Long Island have engaged in street wars with rival gangs, which have resulted in the assault and murder of MS-13 and rival gang members, their family members, and innocent bystanders. (*Id.* at 2-3.) Upon induction into the MS-13 gang, members agree to kill rival gang members whenever possible. (*Id.* at 4.)

The defendant, an alleged associate of the Leeward Locos Salvatruchas clique of MS-13, is charged in connection with the conspiracy to murder two fifteen-year-old suspected members of the rival 18th Street gang—John Doe #1 and Jasson Medrano-Molina—and the subsequent murder of Medrano-Molina. (*Id.* at 3, 6–9.) According to the government, the defendant instigated the murders by identifying Medrano-Molina and John Doe #1 as rival gang members, participated in planning the murders, and assisted the MS-13 gang in carrying out the plan. (*Id.*) More specifically, the defendant allegedly sought out Jose Omar Sorto Portillo, her ex-boyfriend and a known member of MS-13, and, knowing the gang's policy to kill members of rival gangs whenever possible, informed him that several of the individuals he had been recruiting for the gang, including John Doe #1 and Medrano-Molina, were actually members of the rival 18th Street gang.[5] (*Id.* at 4, 6; Goldsmith Rep. 6; Transfer Hearing Tr. at 51:20–52:7; Gov't. Reply Mem. at 4–5.) The defendant then devised a plan with MS-13 members to lure John Doe #1 to a secluded area in Central Islip where Sorto Portillo and others would be lying in wait to murder him. (Gov't. Mem. at 6.) When those attempts were unsuccessful, the defendant suspected that John Doe #1 moved away from the Central Islip area. (*Id.*) After John Doe #1's escape, over a period of weeks in July and August 2019, the defendant allegedly decided to pursue another target rather than abandon the plan. (*Id.* at 7.) Like the plan to murder John Doe #1, the defendant's role was to lure Medrano-Molina to a designated location where Sorto Portillo and a co-conspirator would be waiting to kill him. (*Id.*)

Pursuant to that plan, in the early morning on August 7, 2019, the defendant allegedly contacted Medrano-Molina, who was with another male ("John Doe #2"), via Facebook Messenger, and convinced him to meet her in Central Islip. (*Id.*) She also allegedly attempted to again contact and lure John Doe #1, but was unsuccessful. (*Id.*) That night, Medrano-Molina, John Doe #2, and a third male ("John Doe #3), whom the defendant knew and saw earlier that morning, went to a 7-Eleven on East Suffolk Avenue to buy various drinks, including beer, and the group began drinking together nearby. (*Id.* at 6, 8.) Neither John Doe #2 or #3 were suspected rival gang members. (Gov't. Reply Mem. at 6.) Throughout the night, the defendant allegedly updated Sorto Portillo with text messages as to their whereabouts, and coordinated with him as to where she should

---

the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson,* 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the strength of the evidence supporting those allegations.

[5] Sorto Portillo was arrested several days before the defendant and later charged by juvenile information in connection with the Medrano-Molina murder. On October 20, 2021, Sorto Portillo waived juvenile status, agreed to be prosecuted as an adult, and pleaded guilty to murder in aid of racketeering for his role in the Medrano-Molina murder. He is awaiting sentencing. *See United States v. Sorto Portillo,* 19-CR-423 (S-1) (JFB).

take the three boys, as well at what time. (Gov't. Mem. at 8.)

According to the government, as the defendant plotted with Sorto Portillo, he and his MS-13 co-conspirator were waiting with a .40 caliber pistol and wooden club in a nearby wooded area. (*Id.*) Per the plan, the defendant separated herself from the group, claiming that she had to urinate, walked into the wooded area, and, once at the pre-determined location, messaged Medrano-Molina, claiming that she was injured and needed his help. (*Id.*) Because Medrano-Molina had developed a friendly, even flirtatious relationship with the defendant, he and the other boys went to her aid. (*Id.*; Transfer Hearing Tr. at 66:5–23.) When Medrano-Molina, John Doe #2, and John Doe #3 found the defendant, they were confronted by Sorto Portillo and the co-conspirator, each of whom was wearing a mask. (Gov't. Mem. at 8.) The three boys immediately ran, and John Does #2 and #3 were able to escape harm by hiding in the 7-Eleven. (*Id.*) Medrano-Molina, however, was chased by Sorto Portillo towards a wooded area near a temple, where he was shot multiple times and killed. (*Id.* at 8–9.) Shortly after the murder, the defendant, the co-conspirator, and Sorto Portillo met together at the co-conspirator's house, and then the defendant and Sorto Portillo took a taxi to his home and went inside. (*Id.* at 9.)

On August 16, 2019, the defendant called 911 and requested to speak with law enforcement regarding the Medrano-Molina murder. (Gov't. Reply. Mem. at 4, n. 2.) Prior to the phone call, she allegedly deleted the contents of her phone in an attempt to obstruct the investigation. (*Id.* at 5.) After she waived her *Miranda* rights, the defendant engaged in a two-day long video-recorded interview with law enforcement. (*Id.* at 4.) According to the government, she first attempted to obstruct the investigation by lying to law enforcement about her involvement in the murder and that of her co-conspirators, claiming, *inter alia,* that: (1) she observed two young males dressed in dark clothing nearby at the time of the murder; (2) she might have seen one such male in the woods before she started running away from the attack; (3) one of the John Does who was with them that night was an alleged member of the 18th Street gang and was known to have guns; (4) before they entered the woods, the individual was acting strangely and staring at them with a "menacing look on his face[;]" (5) she thought she was going to die during the attack; (6) she ran to her house immediately after the incident; and (7) she had not spoken to her ex-boyfriend, Sorto Portillo, for approximately one to two months. (*Id.* at 5.) According to the government, she subsequently admitted to her role in the murder, including her ploy to befriend the victims as a means of luring them to their deaths. (*Id.* at 4–5.) She was arrested shortly thereafter.

## II. Legal Standard for Discretionary Transfer

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his [or her] fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson* (*Nelson I*), 68 F.3d 583, 588 (2d Cir. 1995) (quoting 18 U.S.C. § 5032).[6] In evaluating whether a transfer to adult status would be "in

---

[6] In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is

the interest of justice," a district court must consider six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the alleged offenses; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavioral problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See, e.g., Nelson I*, 68 F.3d at 588; *United States v. Doe*, 49 F.3d 859, 868 (2d Cir. 1995).

Although the Court must evaluate each factor identified in Section 5032, it need not afford each factor equal weight, and "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing th[at] factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder." *Id.*

In weighing the factors, "the district court must keep in mind that 'permeating the

transfer decision and the six-factor inquiry is the notion of rehabilitation.'" *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002) (quoting *United States v. Nelson* (*Nelson II*), 90 F.3d 636, 640 (2d Cir. 1996)). Indeed, "[r]ehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions," *Nelson II*, 90 F.3d at 640 (quoting *Nelson I*, 68 F.3d at 590), and "the statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential," *id.*

Even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," that potential "must be balanced against 'the threat to society posed by juvenile crime.'" *Id.* (quoting *United States v. J.D.*, 525 F. Supp. 101, 103 (S.D.N.Y. 1981)). Accordingly, a "glimmer of hope" for a juvenile's future treatment prospects is insufficient to prevent transfer. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640.[7] For the aforementioned reasons, explained more fully below, this

---

a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted the required certification from the then-United States Attorney for the Eastern District of New York.

[7] Section 5032 also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force,

or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard.

Court hereby grants the government's motion to transfer the defendant to adult status.

### III. ANALYSIS OF FACTORS

#### A. Age and Social Background

##### 1. Age

The Second Circuit has instructed that a district court should consider a juvenile defendant's age both at the time of the alleged offense and at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that the district court correctly considered juvenile's age at the time of the offense, but erred in not also considering juvenile's age at the time of the transfer hearing). As for the juvenile defendant's age at the time of the alleged offense, "a crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." *United States v. C.F.*, 225 F. Supp. 3d 175, 184 (S.D.N.Y. 2016) (quoting *Doe*, 49 F.3d at 867). The juvenile defendant's age at the time of the transfer hearing "is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate," considering the older a juvenile defendant is, "the harder it becomes to reform the juvenile's values and behavior." *Nelson I*, 68 F.3d at 589. Accordingly, the older a juvenile defendant is both at the time of the alleged offense and at the time of the transfer hearing, the more the juvenile defendant's age weighs in favor of transfer. *See, e.g., United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *C.F.*, 225 F. Supp. 3d at 184; *United States v. A.O.*, No. 15 Cr. 608-10

(KPF), 2016 WL 4197597, at *5 (S.D.N.Y. Aug. 8, 2016) (collecting cases); *United States v. Doe*, 145 F. Supp. 3d 167, 183 (E.D.N.Y. 2015) (collecting cases).

Here, the defendant was weeks away from her seventeenth birthday when she allegedly began plotting with other MS-13 members to murder John Doe #1 and Medrano-Molina, and was just five days away from her seventeenth birthday when she allegedly participated in the murder of Medrano-Molina. (Gov't. Mem. 12.) At the time of the transfer hearing, the defendant was approximately nineteen years, four months old. Accordingly, the defendant's age at the time of the charged conduct and at the time of the hearing both favor transfer. *See, e.g., United States v. Sealed Defendant 1*, 563 F. App'x 91, 92 (2d Cir. 2014) (affirming transfer where, among other things, juvenile defendant "was just three months shy of his eighteenth birthday when he allegedly committed the offense and twenty years old at the time of the transfer hearing"); *Doe*, 145 F. Supp. 3d at 183 (finding the defendant's age "weigh[ed] heavily in favor of transfer" where he was months away from eighteen years old at time of offense and over the age of eighteen at time of transfer hearing); *United States v. H.V.T.*, No. 96-cr-244 (RSP) (GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) (juvenile's age favored transfer where he was eighteen years old at the time of the alleged conduct and nineteen years old at the time of the transfer hearing).

##### 2. Social Background

The Court must also consider the defendant's social background to the extent that background is indicative of her potential for rehabilitation if adjudicated as a juvenile. As explained below, although recognizing the defendant's severe childhood abuse and the substantial psychological issues resulting therefrom, the Court finds that defendant's

8

social background suggests a low likelihood of successful rehabilitation if the defendant were adjudicated as a juvenile. Accordingly, the Court finds that this factor weighs in favor of transfer.

The defendant was born in La Union, El Salvador to an unwed and impoverished mother. (Def. Mem. at 1.) Her mother left for the United States when the defendant was three-and-a-half years old, leaving her in the care of her paternal grandparents, who treated her well. (*Id.*) Although her father was originally estranged from her and her mother, both he and the defendant's stepmother took control of her after her grandparents' passing when she was six. (*Id.*) It was at this point that the defendant began to experience emotional and physical abuse on almost a daily basis. She was prohibited from speaking with her mother in private (if at all), deprived of clean clothing and other essential needs, woken up before dawn to cook, clean, and perform chores for her father's family, and any money that the defendant's mother sent from the United States was diverted away from her. (*Id.* at 1–2; Goldsmith Rep. at 7.) She was told that her mother did not care about her, did not want her, and did not love her. (Transfer Hearing Tr. at 23–24: 24–3.) Her father also mercilessly beat her on several occasions, and she has multiple scars on her back from being beaten with a metal cord. (Goldsmith Rep. at 7.)

Concurrent with this abuse, when the defendant turned seven—and until the age of eleven when she arrived in the United States—she was sexually abused and raped by her older stepbrother, whom she believed to be a member of the MS-13 gang. (Def. Mem. at 4.) He threatened to kill her if she ever revealed the abuse, and she lived in constant fear of being murdered by either her father or stepbrother. (*Id.* at 2.) It was not until one particularly gruesome day of beatings that the defendant was able to escape

to a neighbor's home and alert her mother as to the abuse and the dire nature of her situation. (Transfer Hearing Tr. at 21:8–13.) Shortly thereafter, the defendant arrived in the United States at age eleven to live with her mother. (Transfer Hearing Tr. at 34:13–17.)

Her mother, stepfather, and aunt provided a loving and supportive home environment in Central Islip and enrolled her in the local public school. (Goldsmith Rep. at 4, 9). Still suffering from the physical and emotional trauma she had endured, however, the defendant struggled with trusting others (especially her mother) and isolated herself. (*Id.*; Def. Mem. at 8.) The defendant had particular difficulty with her mother because she blamed her mother for the abuse she had endured, claiming that none of it would have happened had her mother taken the defendant with her to the United States. (Def. Mem. at 3.) The defendant was close with her aunt, however, reporting that she was "the only one who ever treated [her] well." (Goldsmith Rep. at 7.)

The defendant also struggled because she spoke no English at the time and found the school environment to be unwelcoming. (Goldsmith Rep. at 9.) She reported having persistent nightmares about the sexual abuse she had endured, "just want[ing] it all to end." (*Id.* at 3.) She began smoking cannabis at the age of 13 to self-medicate, quickly becoming a "heavy user," and began engaging in self-injurious cutting behaviors. (*Id.* at 5.) By her first year in high school, despite the loving and supportive environment she had at home, the defendant began skipping school to spend time with other Spanish-speaking young people in local parks in Central Islip. (*Id.* at 9.) At the age of sixteen, the defendant dropped out of school and moved in with her then-boyfriend, Sorto Portillo, and his family. (*Id.*) As discussed above, Sorto Portillo was an MS-13 member at the time

and, according to the government, held the title of "Homeboy," the highest rank in the Leeward Locos Salvatruchas clique. (Gov't. Reply Mem. at 5, n.4.) The defendant reported to Dr. Goldsmith that she felt safe with Sorto Portillo, he treated her well, and never judged her. (Goldsmith Rep. at 6.)

Upon entering into this relationship, the defendant was well aware of the MS-13 gang's extremely violent objectives, as she had been exposed to the gang from early childhood in El-Salvador, suffered greatly at the hands of her stepbrother in the gang, knew the gang was "dangerous," and made clear that she could recognize members by "the way they walk" and "the way they express" themselves. (Id.) Dr. Goldsmith described the defendant's decision to associate with the gang despite her knowledge of the above as a trauma response—that her damaged self-image caused her to gravitate toward the gang because she believed herself to be a "monster" deserving of abuse. (Transfer Hearing Tr. at 57:1–3; 85:6–17.)

Less than one week before the murder, on August 1, 2019, the defendant attempted to commit suicide by overdosing on Tylenol. (Id. at 14:13–23; Goldsmith Rep. at 10.) She was taken to South Shore University Hospital Emergency Department, and was admitted, assessed, and transferred to Cohen Children's Medical Center for inpatient psychiatric treatment. (Goldsmith Rep. at 10.) The defendant allegedly participated in the murder just one week later.

The defendant is presently enrolled at Sojourn High School in the Essex County Juvenile Detention Center. She has taken great effort to become fluent in English, and has received a fair number of As and Bs in

her courses. (Def. Ex. F.) However, notwithstanding this academic progress, the defendant committed two disciplinary infractions in 2021, one for possessing contraband in January and one for fighting in May. (Def. Ex. D at 6, 33.) Specifically, the contraband she possessed included a shank. (Id. at 6.) According to the detention facility records submitted by the defense, during a mental health check-in with the defendant after the contraband infraction, she smiled and stated that she was not remorseful. (Id.) She defended her fight with another inmate because she felt "disrespected" and noted that the individual "needed to humble herself." (Id. at 33.)

The Court finds that the defendant's social background, taken in its entirety, suggests a very low likelihood of rehabilitation within the period of time before her release if convicted as a juvenile.[8] Dr. Goldsmith concluded in his report that, "with comprehensive treatment for her complex PTSD and cannabis use disorder condition, [the defendant]'s psychiatric and substance abuse condition will improve, and her risk of criminal recidivism will be reduced," and that "[s]he has a good prognosis to be rehabilitated before her 21st birthday." (Goldsmith Rep. at 11.) Although the defense relies heavily on this statement for its argument that the defendant should not be transferred, that argument seemingly ignores the most critical piece of Dr. Goldsmith's conclusion—namely, the defendant's willing participation in comprehensive, ongoing treatment.

Indeed, at the transfer hearing, Dr. Goldsmith made clear that his opinion was "predicated on [ongoing] appropriate treatment," (Transfer Hearing Tr. at 81:14– 21), including intensive therapy with "trauma

---

[8] Specifically, the defendant can receive a maximum of five years' imprisonment if convicted in a juvenile

proceeding. *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii). While this case has been pending, she has already been incarcerated for more than two years and five months.

counselors, trauma therapists, and in a place that specifically, both inpatient as well as outpatient, that specifically deals with PTSD and complex PSTD." (*Id.* at 90:24–91:3.) Additionally, she would "require stress management and interpersonal skills training along with DBT-type treatment to address self-destructive and impulsive behaviors," and would need to be engaged in an "abstinence-based substance abuse treatment program, where she can be given support and skills-building treatment to assist her in maintaining a sober lifestyle." (Goldsmith Rep. at 10–11.) Finally, she would have to stay away from the MS-13 gang.

As to the timeframe for successful rehabilitation, Dr. Goldsmith clarified at the transfer hearing that he did not believe that "someone who has been as traumatized as [the defendant] at such a young age" could resolve their PTSD "within two to three more years of treatment," (Transfer Hearing Tr. at 83:16–20), but that he would expect that "her behaviors [be] under control," she'd "no longer [be] self-destructive or suicidal, she['d] . . . develop[] a commitment to treatment and a commitment to remaining in treatment and understanding [of] what her treatment plan is, and demonstrat[e] her, you know, commitment to that. That would be recovery." (*Id.* at 83:16–84:2.) Thus, any progress towards successful rehabilitation is conditioned on a full commitment to extensive treatment by the defendant.

Here, the potential success of these long-term rehabilitation efforts has been undermined by the defendant's failure to show a strong commitment to the treatment plan. For example, as reported by Dr. Goldsmith, the defendant has refused to participate in ongoing treatment in the jail at this time. Moreover, she has never renounced the MS-13 gang or its activities. In addition, as noted above, the defendant has incurred disciplinary infractions, including

possession of a weapon. Dr. Goldsmith even acknowledged at the hearing that "[s]he has not shown that commitment [to rehabilitation] at this point," and that without appropriate treatment, he does not believe the defendant would have a good prognosis. (*Id.* at 81:14–21.) Indeed, without the recommended intensive treatment, Dr. Goldsmith believes that the defendant will likely continue, as before, to engage with the gang as "part of the distorted and disturbed interpersonal, traumatized interpersonal problems that she has." (*Id.* at 36:7–10.)

In short, because the defendant's feelings and self-distortions described by Dr. Goldsmith are so inextricably linked to the defendant's involvement with the MS-13 gang, and given the absence of any clear commitment by the defendant to rehabilitation efforts, this Court is unable to conclude at this juncture that there is any likelihood of rehabilitation in the period of time that would be available for such treatment if she is adjudicated as a juvenile.

In reaching this conclusion, the Court does not overlook, in any way, the extreme abuse the defendant experienced in El Salvador. "The relevant inquiry, however, is whether this background suggests that [the defendant] will respond to rehabilitative efforts while being treated as a juvenile." *See A.O,* 2016 WL 4197597, at *7 (granting the government's motion to transfer the defendant to adult status despite his supportive family at home, his experience of abuse as a child, and his PTSD stemming from such abuse (citing *United States v. Juvenile Male,* 844 F. Supp. 2d 333, 340 (E.D.N.Y. 2012) ("Although defendant indicated to Dr. Drob that he would like to remove himself from past gang associations, take college courses, and develop a career, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself

in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged."))); *H.V.T.*, 1997 WL 610767, at *4 ("[T]he defense's expert psychologist[] testified that H.V.T.'s separation from his mother at a young age, his lack of role models or attachment figures, and his older brother's death left H.V.T. highly vulnerable to being misdirected by others . . . . It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States.  Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home . . . .  It also appears that H.V.T. became a member of a gang.  He wears a tattoo containing a dragon and the letters [of his gang] . . . .  H.V.T. has been for some time completely estranged from his aunt in Florida who took him in following his prior conviction, and his brother indicates that he has had no contact with H.V.T. and would be unable to take care of him.  I find that H.V.T.'s social background favors transfer.").

Although the defendant's current academic strides, willingness to disclose the abuse she endured, and daily communication with her mother are certainly positive signs, the Court finds (as discussed more fully *infra*) that those signs are outweighed by her social background with the MS-13 gang and these other strong indications that successful rehabilitation in the short term (that is, by the end of any incarceration in the juvenile system) is extremely unlikely and, thus, that adjudication of the defendant as a juvenile will not adequately protect the public.

B.  Nature of the Alleged Offense

As an initial matter, the Court notes that, in considering this factor, the Court must assume that the juvenile defendant committed the offenses charged and abstain from examining the strength of the

government's evidence.  *See, e.g., United States v. Sealed Defendant*, 714 F. App'x 65, 67 (2d Cir. 2018) ("[T]he district court correctly assumed, for purposes of the transfer hearing, that the government's allegations against B.M. are true."); *Nelson I*, 68 F.3d at 589 ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information.").  Additionally, as explained above, the Court may weigh this factor more heavily than any other when the alleged offense is particularly serious.  *See, e.g., Ramirez*, 297 F.3d at 193 (quoting *Nelson I*, 68 F.3d at 590).

Here, the seriousness of the alleged offenses cannot be overstated.  The defendant is charged with planning and executing the premeditated and brutal murder of a fifteen year-old on behalf of the MS-13 gang.  The government alleges that she instigated the conspiracy to murder the two alleged rival gang members by alerting MS-13 members that such individuals were rival gang members, knowing that the gang's response would be to attempt to murder them.  The defendant then allegedly aided the MS-13 gang in murdering the victim by luring him and two others to a prearranged location in the woods.  As a result of the defendant's alleged conduct, one person was brutally murdered, and two others were put in immediate danger of the same fate before they ran away.

Although not critical to the Court's analysis regarding the transfer, the Court notes that the defendant is also alleged to have attempted to obstruct law enforcement's investigation after the murder.  More specifically, she allegedly destroyed evidence on her phone, contacted the investigators, and lied about her knowledge of the murder.

Given the obvious severity of the alleged

crimes, the Court finds that this factor weighs strongly in favor of transfer, and gives this factor more weight than any other. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as—or even less serious than—the crimes alleged here. *See, e.g., United States v. Wilson*, 149 F.3d 610, 614 (7th Cir. 1998) (district court was "within its discretion to give more weight to the nature of the alleged offense than to the other factors" where defendant was charged with distributing cocaine and crack and had allegedly "brandished a gun and expressed a willingness to use it" in the course of that distribution); *United States v. One Juvenile Male*, 40 F.3d 841, 845–46 (6th Cir. 1994) (district court did not abuse its discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a

national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *A.O.*, 2016 WL 4197597, at *7 (nature of alleged offense was most important factor and weighed in favor of transfer where juvenile defendant was charged with the intentional shooting of two people, the reckless shooting of several others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses); *United States v. Doe #1*, 74 F. Supp. 2d 310, 321 (S.D.N.Y. 1999) (although majority of factors weighed against transfer, transfer was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior").

## C.  Nature and Extent of Any Prior Delinquency Record[9]

The government states that it is "not aware of any prior criminal history for this defendant" (Gov't. Mem. at 18), and defense counsel represents that the defendant has no "prior delinquency record whatsoever." (Def. Mem. at 10). Accordingly, the Court finds that this factor weighs against transfer. However, the Court notes that the absence of a prior delinquency record does not preclude the transfer of a defendant to adult status when, as in this case, a balancing of all the statutory factors weighs in favor of transfer. *See, e.g., United States v. Sealed Appellant 1*, 591 F.3d 812, 822 (5th Cir. 2009) (affirming district court's decision to transfer juvenile to adult status despite lack of a prior juvenile

---

[9] There is a Circuit split as to whether this factor is limited to convictions or encompasses unadjudicated conduct like prior arrests. *Compare United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), *with United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Second Circuit has not directly addressed

the issue, and this Court need not resolve this question here because there is no indication that the defendant had ever been arrested before her arrest in connection with the events charged in this case.

record); *United States v. Juvenile Male*, 554 F.3d 456, 468–70 (4th Cir. 2009) (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background).

D. Present Intellectual Development and Psychological Maturity

Generally, a juvenile defendant's "present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." *A.O.*, 2016 WL 4197597, at *7 (citing *United States v. Juvenile Male*, 844 F. Supp. 2d 333, 345–46 (E.D.N.Y. 2012)); *see also United States v. A.A.D.*, 106 F. Supp. 3d 272, 277 (D.P.R. 2015) (citing *J.D.*, 525 F. Supp. at 103–04) ("Transfer to adult status is less favored for juveniles who exhibit low intellectual development and stunted psychological maturity because they are viewed as less responsible for their conduct.")). As noted above, Dr. Goldsmith conducted a psychological evaluation of the defendant, detailed his findings in a written report, and testified at the defendant's transfer hearing. To assist with his evaluation of the defendant's intellectual development and psychological maturity, Dr. Goldsmith reviewed, *inter alia*, her educational records from Central Islip High School and Sojourn High School at the Essex County Juvenile Detention Center. (Goldsmith Rep. at 2.)

With respect to intellectual development, Dr. Goldsmith concluded that the defendant shows "no evidence" of an intellectual deficit, and noted that "[s]he has been able to learn" and "has no reported learning disabilities." (*Id.* at 9.) Specifically, Dr. Goldsmith noted at the transfer hearing that

the defendant received average to above-average grades in school and was able to become fluent in English since entering the juvenile facility. The defendant is attending school now, is in the equivalent of her senior year of high school, and is working toward her high school diploma. (Transfer Hearing Tr. at 33:21–22.) As discussed in further detail below, Dr. Goldsmith concluded that the defendant suffers, in part, from complex PTSD, but noted at the transfer hearing that such a disorder does not have an impact on intellect. (*Id.* at 29:11–25; Goldsmith Rep. at 10.) Instead, the traumas *can* have the ability to impact one's ability to utilize one's innate intelligence for achieving in school, but, as Dr. Goldsmith noted, "since [the defendant's] placement in the juvenile facility and the additions of some support to assist her with the containment of her emotions she's actually been able to learn," become fluent in English, and work towards her high school degree with solid grades. (Transfer Hearing Tr. at 29:22–30:2.)

As to the defendant's psychological maturity, Dr. Goldsmith observed that the defendant's complex PTSD and extraordinary amount of cannabis use have negatively affected her social and emotional development and psychological maturity. (Goldsmith Rep. at 10.) Indeed, he observed that the defendant "evidences dysregulation of her emotions, a damaged self-image, recurrent depression and negative moods, impulsive behaviors, impaired interpersonal relationships with difficulty forming attachments, problems with trust[,] and associated fears of abandonment and loss." (*Id.*) Dr. Goldsmith also reported that the defendant evidences impaired judgment and difficulty with decision-making. (*Id.*) He stressed that, instead of being able to form positive and trusting relationships, the defendant is regularly stuck in a pattern of self-loathing, views herself as a "monster," and "has been victimized to such an extent

that it's the only thing that she . . . know[s] [is] to be part of some other victimization experience." (Transfer Hearing Tr. at 29:6–10.) Indeed, Dr. Goldsmith attributes the defendant's decisions to drop out of school and engage in the alleged acts here to her trauma. (*Id.* at 29:3–6.)

The government argues that the defendant's actions over this extended period of planning, and even fleeing to her co-conspirator's home after the murder, suggest that "her participation was not the result of a youthful lapse in judgment, which she failed to properly consider and quickly regretted, but was something she was prepared for and unrepentantly executed as planned." (Gov't. Mem. at 21); *see also Juvenile Male*, 2015 WL 6550344, at *8 ("[I]t does not appear that low intelligence, immaturity, or some type of mental or cognitive impairment can adequately explain the defendant's decision to join the MS-13 gang and participate in violent activity, including an alleged brutal murder.").

The Court finds that, on balance, this factor is neutral. The Court accepts Dr. Goldsmith's finding that the defendant is psychologically immature, despite the premeditation involved in the alleged acts, which weighs against transfer. However, even putting aside the allegations regarding the obstruction of justice, the defendant's cognitive abilities are clear from Dr. Goldsmith's report and testimony, and from the defendant's academic records. Put simply, despite any emotional immaturity, the defendant "ha[s] the cognitive ability to conform [her] conduct to the law," *United States v. A.R.*, 203 F.3d 955, 962 (6th Cir. 2000) (also noting that "courts have generally concluded that lower maturity and

intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law." (citing *One Juvenile Male*, 40 F.3d at 845)), and "possesses sufficient intellectual capacity and psychological maturity to, if [s]he so chose, conform [her] conduct to the law and to appreciate the gravity of the charges [s]he is facing," *United States v. Juvenile Male*, 16-cr-510, 2017 WL 3913174, at *9 (E.D.N.Y. Sept. 7, 2017). Accordingly, the Court finds that this factor is neutral.[10]

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

It is undisputed that, prior to her current incarceration, "it does not appear that [the defendant] has received any systematic treatment for her PTSD." (Def. Mem. at 12 (citing Goldsmith Rep. Ex. A at 10.)) Less than one week before the alleged murder, the defendant was taken to Southside Hospital in Long Island after a suicide attempt involving an overdose of Tylenol on August 1, 2019. (Transfer Hearing Tr. at 14:13–23; Goldsmith Rep. at 10.) She was briefly evaluated at Southside Hospital and then sent to Cohen Children's Hospital for inpatient treatment, but was there for a very brief time, and received no long-term counseling following her discharge. (Def. Mem. at 13.) She denied suicidal intent at both hospitals, and there is no evidence that she was willing to disclose any of the persistent childhood physical, emotional, and sexual abuse she endured to the clinicians. (Transfer Hearing Tr. at 77:15–21.)

Defense counsel argues that the defendant has taken a "significant step" since her arrest by beginning to speak about her

---

[10] Even if this factor weighed against transfer, it would not alter the Court's conclusion that the transfer is warranted based upon the nature of the alleged offenses and that the defendant's rehabilitation is only

at is nascent stage, with strong indications of significant obstacles to such rehabilitation including, among other things, the defendant's refusal of treatment and her disciplinary infractions.

traumas, thus "moving towards productive positive behavior." (*Id.* at 33:16–17; Def. Mem. at 13). Unfortunately, however, that initial progress does not support a finding that there is any likelihood that she will not pose a danger to society if her case were adjudicated in the juvenile system. Indeed, despite briefly seeing Dr. June, a psychologist at the Essex County Juvenile Detention Center, the defendant has refused—and continues to refuse—ongoing treatment. (Transfer Hearing Tr. at 41:10–11.) Dr. Goldsmith remarked that he was not surprised that the defendant had discontinued treatment, noting that her trust issues, largely stemming from her PTSD condition, would not allow her to open up. (*Id.*) Specifically, Dr. Goldsmith stated that the defendant "can only take it so far within the juvenile detention facility," as she fears that any information she discloses could potentially be used against her in some way at this pre-trial stage. (*Id.* at 41:10–20.) Dr. Goldsmith's report made clear that the defendant's "trauma-based difficulties with trust, concerns about disclosing during the pretrial phase of her case and her overall negative self-image with feelings of hopelessness have been impediments to treatment." (Goldsmith Rep. at 10.)

The Court concludes that the record does not support the conclusion that the defendant will be rehabilitated in the juvenile system (with its maximum period of incarceration of five years) such that she will not pose a danger to the public because of a significant risk of recidivism. In addition to her refusal to engage in ongoing treatment with Dr. June, neither Dr. Goldsmith nor any other mental

health professional has been able to explore the defendant's relationship with the MS-13 gang or the events at issue in this case. (*Id.* at 49:12–24.) Thus, Dr. Goldsmith had no insight into her current views towards the MS-13 gang, such as whether the defendant has any continuing feelings of loyalty to it.[11] (*Id.* at 84:24–86:2.) Moreover, as noted *supra*, the defendant committed two disciplinary infractions in 2021, one for possessing contraband in January and one for fighting in May. (Def. Ex. D at 6, 33.) Specifically, the contraband she possessed included a shank. (*Id.* at 6.) During a mental health check-in with the defendant after the contraband infraction, she smiled and stated that she was not remorseful. (*Id.*) She defended her fight with another inmate because she felt "disrespected," and noted that the individual "needed to humble herself." (*Id.* at 33.) *C.f. C.F.*, 225 F. Supp. 3d at 197 (finding this factor weighed strongly against transfer where, among other things, the juvenile "ha[d] not incurred any disciplinary infractions at Sojourn since his juvenile detention ha[d] begun" and had "been commended for peaceful behavior, joined the facility's church group, and responded well to the juvenile setting").

Indeed, at the hearing, Dr. Goldsmith agreed that the defendant was in the "very nascent stages of her progress." (Transfer Hearing Tr. at 72:11–14.) Dr. Goldsmith re-emphasized that point in response to many questions about the rehabilitation efforts. For example, Dr. Goldsmith explained:

> [W]hat she of course will need to do and is beginning to address is accept

---

[11] The government argues further that the defendant's failure to discuss the alleged details of the offenses with Dr. Goldsmith, or to express remorse for her involvement in the alleged crimes, undermines Dr. Goldsmith's ability to properly assess her prognosis in terms of rehabilitation. (Gov't. Reply Mem. at 6.) However, the Court accepts Dr. Goldsmith's

explanation regarding this issue and has not considered the defendant's failure to express remorse or discuss the alleged crimes with Dr. Goldsmith in assessing the weight to be given to his opinions or in granting the motion to transfer.

what she did and recognize, you know, the harm that she has caused and see it not from the perspective of herself as being a traumatized person, but recognize that someone else has now suffered because of her trauma and be able to feel that experience, express that remorse, understand how she got herself to that place. And that is all the beginnings of what I'm seeing in [the defendant].

(*Id.* at 89:24–90:8) (emphasis added); *see also* (*id.* at 73:22–23) ("[I]t's all part of the recovery, the beginnings of it"); (*id.* at 75:6–9) ("You know, she's so traumatized, her state of mind has been so defined by this trauma that the recovery is just going to be a long-term process for her."); (*id.* at 84:14–18) ("[T]his is the early stages of her recovery and she has made progress); (*id.* at 89:12–14) ("[S]he is recognizing the beginnings of things she has to do to make some changes to get herself on that road to recovery"). Moreover, although Dr. Goldsmith was hopeful that the defendant would decide to return to treatment, he acknowledged that "[a]bsolutely she is not at that point now." (*Id.* at 74:3.)

In sum, because the defendant has refused to commit to ongoing mental health treatment and there are other indicators that there are impediments to rehabilitation (especially in the short term), including disciplinary infractions, the Court finds that this factor weighs in favor of transfer.

F. Available Programs Designed to Treat the Juvenile's Behavioral Problems

Under this factor, the government bears the burden of establishing a lack of available programs designed to treat the juvenile's behavioral problems. *See, e.g.*, *Nelson I*, 68 F.3d at 591. With respect to whether programs would be available to the defendant here if convicted as a juvenile, the government asserts that there are no federal facilities for individuals adjudicated as juveniles. (Gov't. Mem. at 23.) Instead, adjudicated juvenile delinquents from this district are sent to state contract facilities for juveniles. (*Id.*) According to the government, there are no contract facilities in New York that would be available to someone the defendant's age. (*Id.*) The government does note, however, that state contract facilities in Pennsylvania and Maine would potentially be available to the defendant. (*Id.*)[12] Thus, the government concedes that this factor "may weigh slightly against transfer." (*Id.*) The government does not provide any information about treatment programs that would be available to the defendant if adjudicated as an adult.

As noted by the Second Circuit, "[f]or the government to carry its burden of persuasion [on this factor,] it must, of course, do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is some indication that state juvenile facilities in Pennsylvania and Maine might be available to the defendant.[13] Accordingly, the Court finds that the government has not met its burden on this factor and that this factor weighs against transfer. *See United States v. Doe #3*, 113 F. Supp. 2d 604, 609 (S.D.N.Y. 2000) (finding factor weighed against transfer where "the government did no more than 'merely assert the unavailability of an

---

[12] Accordingly, the government concedes that this factor "may weigh slightly against transfer." (Gov't. Mem. at 23.)

[13] Defense counsel also asserts that there may be suitable juvenile facilities in South Dakota and Texas. (Def. Mem. at 15.)

appropriate juvenile rehabilitative program' for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (citing *Nelson I*, 68 F.3d at 591)).[14]

\*     \*     \*

In sum, after carefully balancing all the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. The defendant is charged, *inter alia*, with planning and taking part in the execution of the murder of a fifteen-year-old boy and conspiracy to murder another as part of her alleged participation in the violent activity of the MS-13 street gang. These are precisely the types of serious, violent crimes that weigh strongly in favor of transfer. In addition to the gravity of the alleged crimes, other factors—including, among other things, the defendant's age and social background at the time of the murders, her refusal to engage in ongoing treatment, and her two disciplinary infractions—collectively demonstrate that the defendant is not likely to rehabilitate within the juvenile system if she is convicted of the charged crimes as a juvenile and provided with juvenile rehabilitation programs. Furthermore, as discussed above, the fact that the defendant is over eighteen years old, considered in conjunction with the other factors, strongly suggests that she is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, 'the more mature a

juvenile becomes, the harder it becomes to reform the juvenile's values and behavior.'" (citations omitted)); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, notwithstanding that some factors favor a denial of the transfer motion, the Court finds that the defendant's rehabilitation potential within the juvenile justice system is extremely low after balancing all the statutory factors.

As noted above, the Second Circuit has made clear that "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *Nelson II*, 90 F.3d at 640 (quoting *J.D.*, 525 F. Supp. at 103). Given the record in this case, the Court concludes in its discretion that there is no likelihood that the defendant will not pose a threat to society upon her release if her charges are adjudicated in the juvenile system. Accordingly, given that the crimes charged here are extremely violent and the threat to society posed by these crimes is at the highest level, and given that the overall record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is

---

[14] Although the Court finds that this factor and the factor regarding the lack of any prior delinquency record weigh against transfer, the Court also finds that these factors do not warrant maintaining the defendant's juvenile status because the overall

balancing of the statutory factors overwhelmingly favors transfer.

granted.

### IV. CONCLUSION

For the reasons explained above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice.    Accordingly,    the    government's motion to transfer the defendant to district court for prosecution as an adult is granted.


SO ORDERED.


s/ Joseph F. Bianco
_____
JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: January 26, 2022
        Central Islip, New York

                    * * *

The United States is represented by Breon S. Peace, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722, by Paul G. Scotti and Justina L. Geraci, Assistant U.S. Attorneys, and Kathleen Kearson, Special Assistant U.S. Attorney.    Defendant Juvenile Female is represented by Zachary S. Taylor, Taylor & Cohen LLP, 305 Broadway, 7th Floor, New York, New York 10007.