**FILED**
**CLERK**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK    1/2/2024 10:03 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

```
UNITED STATES OF AMERICA       *    Case No. 19-CR-00431(JFB)
                               *
                               *    Long Island Federal
                               *     Courthouse
                               *    100 Federal Plaza
        v.                     *    Central Islip, NY  11722
                               *
LIDIA DELCARMEN-RODRIGUEZ,     *    November 27, 2023
                               *
            Defendant.         *
                               *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOSEPH F. BIANCO
VISITING UNITED STATES CIRCUIT JUDGE

APPEARANCES:

For the Government:          PAUL G. SCOTTI, ESQ.
                             JUSTINA L. GERACI, ESQ.
                             MEGAN E. FARRELL, ESQ.
                             Asst. United States Attorney
                             United States Attorneys Office
                             610 Federal Plaza
                             Central Islip, NY  11722

For the Defendant:           ZACHARY S. TAYLOR, ESQ.
                             Taylor & Cohen, LLP
                             305 Broadway, 7th Floor
                             New York, NY  10007

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

1          (Proceedings commenced at 11:20 a.m.)

2          THE CLERK:  Calling Case 19-CR-431, USA versus Lidia

3     DelCarmen-Rodriguez.

4          Counsel, please state your appearance for the

5     record.

6          MR. SCOTTI:  Good morning, Your Honor.  Paul Scotti,

7     Megan Farrell and Justina Geraci for the United States.

8          THE COURT:  Good morning to all of you.

9          MR. TAYLOR:  Good morning, Your Honor.  Zachary

10    Taylor, here on behalf of Lidia DelCarmen-Rodriguez.  I'm also

11    joined at counsel table by our mitigation specialist, Jill

12    Steinberg.

13         THE COURT:  Good morning to both of you.

14         And as noted, Ms. DelCarmen-Rodriguez is present at

15    counsel table with the assistance of the Spanish interpreter

16    who is on staff here.  I would just ask that the interpreter

17    identify herself for the record.

18         MS. GRAY:  Good morning, Your Honor.  Maya Gray,

19    Spanish Interpreter.

20         THE COURT:  Good morning, Ms. Gray.

21         We're here for sentencing.  Are both sides ready to

22    proceed?

23         MR. SCOTTI:  Yes, Your Honor.

24         Before we go any further, I just did want to bring

25    to the Court's attention that we do have some family members

3

1    of the victim who are here in attendance today.  We have the

2    victim's uncle, his mother, Jessica Diaz, his grandmother,

3    Patricia Diaz, as well as his two brothers.

4            And I do believe that both the victim's mother and

5    grandmother do wish to address the Court during today's

6    proceedings, so I just wanted to bring that to the Court's

7    attention.

8            THE COURT:  Thank you for bringing that to my

9    attention.

10           And good morning to all of you as well.

11           So is the defense ready to proceed with sentencing

12   as well?

13           MR. TAYLOR:  Yes, Your Honor.

14           THE COURT:  I just want to review what documentation

15   I have in connection with the sentencing.  I want to make sure

16   that I have all the documents that you have submitted and that

17   obviously you have all the documents that are before the

18   Court.

19           I have the pre-sentence report.  I have the

20   Probation Department's recommendation of 22 years

21   imprisonment.

22           I have the Probation Department's addendum

23   addressing objections from defense counsel to some information

24   in the pre-sentence report.  I have the Government's September

25   7th letter, which seeks a sentence of 25 years.  I just want

4

1    to note, just so the record is clear, there appear to be some

2    typos within the letter that said 35.

3                The Government is seeking 25, correct?

4                MR. SCOTTI:  Yes, Your Honor.  That was a typo.

5                THE COURT:  All right.  And defense counsel has

6    submitted a September 16th sentencing submission with various

7    exhibits, including a letter from Ms. DelCarmen-Rodriguez, and

8    the mitigation report, and other documents as well.  I also

9    received a November 20th supplemental submission from the

10   defense responding to the Government's submission.

11               Is there anything else I should have in connection

12   with the sentencing from the Government?

13               MR. SCOTTI:  Nothing from the Government, Your

14   Honor.

15               THE COURT:  Anything else from the defense?

16               MR. TAYLOR:  No, Your Honor.

17               THE COURT:  And, Mr. Taylor, have you and your

18   client received the pre-sentence report, the recommendation,

19   and the addendum?

20               MR. TAYLOR:  Yes, Your Honor.

21               THE COURT:  You've had sufficient time to review it

22   with her?

23               MR. TAYLOR:  Yes, Your Honor.

24               THE COURT:  Let me just confirm that with Ms.

25   DelCarmen-Rodriguez.

5

1          Ms. DelCarmen-Rodriguez, have you received and had

2     sufficient time to review and discuss with your attorney the

3     pre-sentence investigation report, the recommendations, and

4     the addendum?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  So there's one objection

7     that was noted that I just want to address, and then I'll see

8     if there are any other objections.

9          I don't think, although the addendum did incorporate

10    some information requested by defense counsel in the

11    sentencing submission on page 7, Mr. Taylor requests that

12    paragraphs 53 through 62 be modified to reflect the various

13    medical issues that Ms. DelCarmen-Rodriguez has.  There is

14    reference to some of those things in the pre-sentence report,

15    but I think he wanted it to be more fulsome.

16          Is that accurate?

17          MR. TAYLOR:  Yes, that's accurate, Your Honor.

18          Probation has addressed these issues in the

19    addendum, but we would prefer for it to be in the PSR itself.

20    Because my understanding is when Ms. DelCarmen-Rodriguez

21    arrives at her facility, the PSR is like the bible as it, you

22    know, comes to her.

23          THE COURT:  So you're satisfied --

24          MR. TAYLOR:  -- and I want it to be clear --

25          THE COURT:  Yeah.

6

1          MR. TAYLOR:  -- what those positions are.

2          THE COURT:  You're satisfied that the addendum's --

3          MR. TAYLOR:  So my preference, Your Honor, would be

4     to --

5          THE COURT:  I was going to incorporate what you

6     wrote in your letter, and just tell them to amend the pre-

7     sentence report to contain the information on page 7 of your

8     letter --

9          MR. TAYLOR:  That's fantastic, Your Honor.  Thank

10    you.

11         THE COURT:  -- and to prepare a revised report that

12    will travel with her.

13         MR. TAYLOR:  Perfect.  Thank you, Your Honor.

14         THE COURT:  The Government have any objection to

15    that?

16         MR. SCOTTI:  No Objection, Your Honor.

17         THE COURT:  All right.  So having resolved that

18    issue, Mr. Taylor, does your client have any objections to the

19    pre-sentence report?

20         MR. TAYLOR:  No, Your Honor.

21         THE COURT:  Does the Government have any objections

22    to the pre-sentence report?

23         MR. SCOTTI:  No, Your Honor.

24         THE COURT:  I adopt the information contained in the

25    pre-sentence report as factual findings by the Court pursuant

7

1   to *United States vs. Booker*.  The sentencing guidelines are

2   advisory.  They're only one factor the Court is to consider

3   among all of the statutory factors.  The advisory guideline

4   range in the pre-sentence report is calculated to be a level

5   40, criminalistic category one, with an advisory range of 292

6   to 365 months.

7          Do both sides agree that that's the proper

8   calculation of the advisory range.

9          MR. SCOTTI:  Yes, Your Honor.

10          MR. TAYLOR:  Yes, Your Honor.

11          THE COURT:  I agree as well.  Just again, so the

12   record is clear, the base offense level for murder is 43.

13   Because Ms. DelCarmen-Rodriguez pled guilty in a timely

14   fashion, she's entitled to a three level reduction for

15   acceptance of responsibility, which reduces it to a level 40.

16   She has no criminal history.  She's a criminalistic history

17   category one, which results in the 292 to 365 month range.

18          I should also note for the record, and I think the

19   parties will confirm that they agree, although at the time the

20   report was prepared the Probation Department said that the

21   924(j) charge carried a mandatory minimum of 10 years, that

22   pursuant to the Supreme Court decision that there is no

23   mandatory minimum.

24          Correct?

25          MR. SCOTTI:  Yes, Your Honor.

8

1          THE COURT:  Correct?

2          MR. TAYLOR:  Yes, Your Honor.

3          THE COURT:  So there's no mandatory minimum that

4    applies to this case.

5          So, as I said, the guideline range is advisory.

6    It's just one factor the Court is to consider among all the

7    statutory factors that I'm now prepared to hear from both

8    sides.

9          But before I do that, I want to hear from the

10   victim's family first.

11         And the Government indicated that the victim's

12   mother, Ms. Diaz, would like to speak.  And the grandmother.

13   The mother would like to go first?

14         MR. SCOTTI:  Yes, Your Honor.

15         THE COURT:  Good morning.

16         MS. MOLINA:  Good morning.

17         THE COURT:  Just please state your name for the

18   record.

19         MS. MOLINA:  My name is Jessica Molina, the mother

20   of Jasson Xavier Medrano.

21         THE COURT:  Okay.  Good morning.  Take your time.

22   We're in no rush.

23         MS. MOLINA:  Good morning.  Every day I see his

24   photo and I see his beautiful smile and suddenly I feel an

25   immense pain, a pain which doesn't finish, knowing that he is

9

1     not with me, with his siblings, with his family.  Every day is

2     difficult.  And even more when Christmas comes and it's so

3     difficult, it's a pain that we will never be able to overcome.

4          The whole family has suffered a whole lot.  My

5     children and I have suffered a lot due to the loss of Jasson.

6     Since that day, our life has changed.  And we know how hard it

7     is to be anxious, depressed, because the loss of Jasson has

8     been devastating, in fact, and this will be for the rest of

9     our lives.

10          Only because of people like that criminal with a

11    perverse mind and with bad intentions.  She knew everything

12    that was going to happen and she did nothing to stop it.

13         Because of all you did, you do not deserve the privilege

14    of the most beautiful thing, to live with freedom, because

15    you're an evil woman without feelings.  You're a danger to

16    society.

17          Justice for Jasson.  Thank you, Your Honor.  And I

18    thank the attorneys who have worked so hard to make sure that

19    justice is served.

20          THE COURT:  Well, thank you for your words today.

21          And I know I said to you, said some of things I'm

22    about to say to you at Mr. Sorto Portillo's sentencing, but I

23    want to emphasize them.

24          And I know how difficult it is to come back again

25    and to be here, and it takes a lot of courage to do what

1   you're doing today.

2          I want to express my deepest condolences to you, to

3   your whole family, for the loss that you have suffered.

4          And I was actually thinking, as I was preparing for

5   the sentencing last week, how especially difficult, you made

6   reference to how especially difficult the holidays are, but I

7   want to assure you, and I think it's very important that

8   you're here, that I hear your words again, that Ms. DelCarmen-

9   Rodriguez hears your words, and that the public hears your

10  words.  It's very, very important.

11         And I want to assure you that the sentence that I am

12  imposing today reflects the loss of life, the loss of your

13  son's life.  It will reflect the harm, not only to him, but to

14  your whole family, because I know that you will live with this

15  forever.  Your family's life will never be the same and that

16  that emotional and psychological devastation will always be

17  there.

18         So I just want to assure you that I understand that,

19  and that I'm doing the best that I can to make sure that this

20  sentence is a just one that reflects those things.

21         The law requires me to consider other factors, not

22  just those factors, but other factors as well.

23         But you can be fully confident that I fully

24  appreciate the loss that you have suffered.  And thank you

25  again for being here.

1          MS. MOLINA:  Thank you, Your Honor.  Justice for

2     Jasson.

3          THE COURT:  Good morning.  Please state your name

4     for the record.

5          MS. DIAZ:  Good morning, Members of the Jury.

6          THE COURT:  If you could just -- if you could just

7     state your name for the record.

8          MS. DIAZ:  My name is Patricia.  I am the

9     grandmother of my child that I don't have with me anymore.  I

10    loved him very much and he did too.  The family was very proud

11    of him because he was a hard-working child, and he studied

12    hard, and he was at the best time of his life, and he didn't

13    see evil towards anyone.

14          When this happened, I thought I had the courage and

15    I would ask myself who was the person that caused so much harm

16    to the family?  And I asked god for justice, justice in heaven

17    and here on earth.

18          And when I realized that this person had been

19    arrested, I gave thanks to god, and I looked to heaven and I

20    sighed.

21          How could this woman do so much harm to my grandson?

22          She is also guilty knowing she did nothing to

23    prevent it.  She's a liar and hypocrite pretending to be a

24    friend of my grandson.  She caused harm to my family, to my

25    son, siblings, to the aunts and uncles.  Not only did she do

12

1    harm to my grandson, to the entire family.

2              How could she -- her heart be so cruel and so evil?

3              Nobody has the right to take away another person's

4    life.  This woman deserves the full impact of the law.  I beg

5    you, Your Honor, the full impact of the law.  I'm asking for

6    the maximum punishment for this woman.  She's a danger to

7    young people.  She could do it again, commit the same crime

8    again.  Persons like her do not deserve to outside.

9              My grandson did not deserve to die like this.  He

10   was a good child, popular, he trusted everybody.  He had no

11   evil towards anyone.  My grandson -- my son lit up.

12   Everywhere that he was he would light things up.  And you the

13   murderer, you (indiscernible).  But you deserve, because

14   you're so evil, (indiscernible) and let you have no peace for

15   the rest of your life.

16             THE COURT:  Well, let me just, again, also extend my

17   condolences to you as well.  I hear the anguish in your voice.

18   I can see it in your face.  And in your daughter's as well.

19             Again, I assure that this sentence will reflect the

20   loss that you have suffered and continue to live with going

21   forward.

22             One of the requirements the Court is to consider is

23   what a just sentence should be and I certainly have that in my

24   mind as I impose sentence today.

25             Thank you, again, to both of you.

13

1          MR. SCOTTI:  Your Honor, I'm sorry to interrupt the

2     Court.  We've been advised that the uncle, Jorge Alexander,

3     also would like to address the Court if that's permissible.

4          THE COURT:  Yes.

5          MR. SCOTTI:  Thank you.

6          THE COURT:  Does he need the interpreter?

7          MR. SCOTTI:  Yes, Your Honor.

8          THE COURT:  Mr. Alexander, you can come forward.

9     Can you please state your name for the record.

10         MR. ALEXANDER-MOLINA:  Good morning.  I'm Jorge

11    Alexander-Molina.  I'm Jasson's uncle.

12         First of all, I would like to address once again the

13    perpetrator.  I want to remind her her  name is Jasson Xavier

14    Medrano, remember all your life about him.  He will be present

15    to you forever.

16         He wasn't guilty of everything that happened to him.

17    He was a saint.

18         I hope you have a long life, very long life, but

19    very unhappy, because of all the things you did.  Because your

20    hands are covered with blood.  Even though another person did

21    it, you have your hands covered with blood.

22         I hope you remember his name, Jasson Xavier Medrano.

23    That's his name.  He had his own light.  You have no light

24    ever.  You will have an unhappy life and it's scarred by what

25    you have done.  It has been the most horrible thing.  As I

14

1    tell you, maybe you were not the person who committed the act,

2    but you have your hands covered with blood as the other

3    person.

4              His name is Jasson Xavier Medrano.  Never forget it.

5    Never until the day you die.

6              Thank you, Your Honor.  And I hope the full impact

7    of the law.

8              THE COURT:  Thank you, Mr. Alexander-Molina.  And,

9    again, I extend my deepest sympathy and condolences to you as

10   well.

11             I'll now hear from the Government.

12             MR. SCOTTI:  Thank you, Your Honor.

13             It's very hard to follow what the Court just heard,

14   when you hear from the family members, the mother,

15   grandmother, the uncle, who are forced now to live the rest of

16   their life suffering because their loved one, their child,

17   this 15-year-old boy, who had his whole life ahead of him, and

18   who they had all of these hopes for, all of these wonderful

19   experiences with, the joys and the pains of raising a child

20   that these family members got to experience, and just when he

21   was at the point of his life where he started to experience

22   more and do more and become a young man, his life was taken

23   from him.  And it was taken from him, and he was taken from

24   his family for nothing, for no reason.

25             And first and foremost, the sentence has to address

1    the devastation that this family feels by the actions of this

2    defendant.  And the sentence also has to address that it was

3    done in furtherance of this insidious, depraved, and evil

4    nature and mission of the MS-13 gang.  And this is the kind of

5    murder that really does demonstrate just how evil the gang is.

6           Jasson Medrano, he didn't hurt anybody that resulted

7    in what happened to him that night.  He wasn't in a gang.  All

8    he did was try to act tough in front of a girl that he liked,

9    and it was just the wrong girl.

10          It was the defendant, someone who was fully involved

11   in the MS-13, someone who knew the rules of the gang, the

12   culture of the gang, and she used some information that she

13   got in order to elevate her own status in the gang and told

14   her gang member friends information that directly resulted in

15   the victim's death.

16          And it's because of her commitment to what the MS-13

17   gang was about, a gang that she knew very well from her

18   upbringing in El Salvador and all of the violence that she was

19   exposed to.  And she knew the gang perpetrated down there.

20   And then she came to this country.  And rather than accept the

21   support and the love of the family she had, she sought

22   friendships and associations with these violent criminals.

23          And it's because of her decisions, her choices, that

24   Jasson is not here today.  It's because of her choices that

25   the defendants -- rather the victim's family is forced to

1  suffer.

2           And one of the 3553(a) factors the Court has to

3  consider is a just punishment obviously.

4           And the defendant has requested a ten-year sentence

5  for this horrific crime.

6           Your Honor, a ten-year sentence obviously would be

7  an injustice.  It would be an injustice to the victim.  It

8  would be an injustice to the family.

9           This defendant deserves not a day less than 25 years

10  that are recommended by the Government.  That's an appropriate

11  sentence when considering all the 3553(a) factors, including,

12  and the *Miller* factors, Your Honor, and when considering the

13  other mitigating factors that have been set forth in great

14  detail, both during the transfer proceedings and in the

15  submissions to the Court in advance of sentencing.

16           But the Government would largely rely on its summary

17  and analysis of those factors as set forth in our sentencing

18  letter.  There are just a few things I want to address more

19  specifically and beginning with the crime itself.  And this

20  was extremely serious.  And I did mention before it's even

21  more serious because it was committed in furtherance of the

22  MS-13.

23           But with respect specifically to this defendant, her

24  vital role in not just the murder of the victim, but even

25  before that in identifying another potential rival for her MS-

1    13 associates who was identified in the -- in the information

2    as John Doe No. 1.

3            So the defendant, over a course of months, in the

4    summer of 2019, was actively assisting her MS-13 associates

5    with trying to identify and locate people that they could

6    kill.  And there was no due diligence done.  It really didn't

7    matter whether or not the person was in a gang.  It was just

8    whether they had enough information that they could use that

9    as justification.  Because the only reason that the defendant

10   and her associates wanted to kill was because that's what you

11   do when you're in the MS-13.

12           And she, of her own choosing, of her own volition,

13   brought these two individuals to the gang members knowing full

14   well what that meant, that it meant that they would be hunted

15   and they would be killed.

16           John Doe 1 was lucky enough to avoid that fate, but

17   Jasson was not.

18           There was nothing impulsive or impetuous about what

19   she did, and that's obviously one of the considerations that

20   the Court has to -- has to analyze with respect to the *Miller*

21   factors.  That doesn't apply here.  This was a cold-blooded

22   and premeditated murder.

23           Additionally, Your Honor, this was even more

24   dangerous because the defendant put the lives of other

25   innocent individuals in danger on that same night.  The victim

1   wasn't alone.  There were other people who were with him,

2   other people who came into the woods when the defendant called

3   them into the woods, who easily could have been injured or

4   killed.  And the fact that the defendant continued to go

5   through with this plan when there were others, people, even a

6   person who she had known from the neighborhood who was

7   present, that shows a complete disregard for human life.

8   Which, again, goes to the seriousness of the offense.  It also

9   goes to the nature and characteristics of the defendant.

10         Furthermore, with respect to the characteristics of

11  this defendant, there was no remorse after taking part in such

12  a horrific event.  And after understanding that this person

13  who she knew, who she had been friendly with, and that

14  friendship is what she used to lure him, was now dead, the

15  defendant didn't distance herself from her co-conspirators.

16  She destroyed evidence.  She lied to law enforcement.  She

17  continued to associate with them until the shooter was

18  arrested.

19         And even in Dr. Goldsmith's interviews, who was the

20  expert who interviewed the defendant several times in support

21  of her opposition to the transfer motion, those -- that report

22  was very thorough.  And there were two, I believe two, lengthy

23  interviews he had with her.

24         And while the defendant -- and it's understandable

25  from a legal standpoint why the defendant might not want to go

1  into detail about what happened, what she did, there was also

2  no expression at all of remorse or regret or empathy or

3  sympathy for the victim or his family.  And this is in the

4  years following the incident.

5         And so it's very -- I think it's very significant

6  that after periods of reflection -- and the Government does

7  understand that the defendant had diagnosable issues, post-

8  traumatic stress due to very tragic circumstances in her

9  upbringing, which I'll address a little later on -- but still,

10 Your Honor, it's that connection to the humanity of it, to the

11 loss of life, that was missing and really has not been

12 demonstrated to this point.

13        There is some reference in the letter she submitted

14 to Court in support of her sentencing submission that did

15 address the pain of the family and the sorrow that she felt,

16 but it was a very limited expression of remorse given the

17 significance of the loss of life and the destruction that was

18 done that night.

19        And, again, with respect to the mitigating factors

20 here, there is much that is before the Court, both from Dr.

21 Goldsmith's report, Dr. Goldsmith's testimony at the transfer

22 hearing, there's also the report that was submitted in support

23 of the sentencing from mitigation expert, Jill Steinberg, a

24 lengthy report there.

25        And the Government does not deny the significance of

1    many of these mitigating factors, particularly the abuse, the

2    trauma, that the defendant asserts she was the victim of

3    growing up in El Salvador.

4            There was the additional incident that was first

5    reported to Ms. Steinberg about a rape that happened while she

6    was in high school.

7            Now, while obviously those are not -- that recent

8    allegation hasn't been corroborated, although I believe the

9    victim's mother did indicate that there was outcry to her, for

10   some reason that did not come out during the transfer hearing,

11   didn't come out through Dr. Goldsmith, didn't come out through

12   the interviews with the mother, but the Government's not in a

13   position to dispute that and we're not going to.

14           I think it's clear to everyone who's been in this

15   case for many years that the defendant's story is a tragic

16   one, but neither her particular circumstances, nor the

17   difficult upbringing, and the unrest in all of the tragic

18   circumstances that are going on in El Salvador, and were going

19   on when she was there, can explain away her conduct.

20           The defendant made choices here.  They were choices

21   she didn't have to make.  And they were choices that resulted

22   in horrific consequences.

23           And so, while the mitigating factors are something

24   that this court certainly will consider, it is also -- it is

25   also -- has to be balanced against all of those things, the

1    offense conduct and her actions before and after, and even in

2    the years after.

3            And the Government has considered those things.

4    Which is why our recommendation is 25 years and is not much

5    longer, which would have been warranted without those specific

6    mitigating factors.

7            And there's also something else, Your Honor, that

8    the Government finds to be troubling.  And that is the part of

9    Ms. Steinberg's report where the defendant seems to try to

10   explain what happened with the -- with her telling the gang

11   about John Doe 1 and the victim and then the circumstances

12   surrounding the night of the murder.

13           As this court is well aware, very significant

14   consideration of a sentence for someone this age, or who was

15   at the age she was when she committed the crime, is

16   rehabilitation, future dangerousness, and a full acceptance of

17   responsibility is an extremely significant thing.

18           And acceptance, without minimizing one's role, shows

19   that someone appreciates what they've done, they understand

20   the harm they've committed, and that makes them less likely to

21   want to engage in that again or commit that kind of harm

22   again.

23           And, in Ms. Steinberg's report, the defendant

24   minimizes her role and her conduct, and not -- doesn't just

25   minimize them, but it's done in extremely irrational and

22

1    unbelievable ways that are completely inconsistent with

2    evidence, including, and really exclusively, evidence that

3    came directly from the defendant and out of her mouth about

4    how these conspiracies to murder, the origins of these

5    conspiracies to murder, happened, and how the murders that

6    night took place.  The defendant fully allocuted to that.

7         There were other -- there was other evidence of -- from

8    the defendant.

9              And, in Ms. Steinberg's report, according to the

10   defendant, these -- the plan to murder the victim and John Doe

11   1 was when she let it slip that they were rivals and that she

12   had no idea what she was doing or what that would lead to.

13             That's completely false.  It's an absurd premise.

14   And it's also inconsistent with the timeline of this case,

15   which we know from the defendant herself that John Doe 1 was

16   the originally target.  When they couldn't kill him, then it

17   pivoted to the victim when the defendant identified the

18   victim.

19             But it's also completely inconsistent with the fact

20   that the defendant did these things because she was a member

21   of the MS-13, and that's why she reported these things to the

22   people that she was friends with and she was associating with.

23             The defendant told this court that when she pled

24   guilty, she did it, that she lured out the victims to be

25   killed.

1          Also, additionally, when she was discussing the

2    murder itself, that the murder happened six or seven days

3    after an attempted suicide, the defendant attempted suicide,

4    that she had believed in her mind that possibly she could lure

5    the victim out to be killed only to take the bullets herself,

6    almost luring him out to be killed only to save him so she

7    could herself die.  And, again, Your Honor, that's also

8    completely irrational and really an absurd minimization of

9    what happened.

10          In fact, what we know from the defendant is that she

11    thought the victims were going to be killed with baseball

12    bats, that guns weren't even going to be involved.  She also

13    tried to lure out John Doe No. 1 that night.  So the level of

14    minimization is greatly concerning.  It shows a lack of

15    acceptance and responsibility and it further warrants a severe

16    sentence.

17          Finally, Your Honor, I touched on a few of the

18    *Miller* factors, but overall the *Miller* factors here don't

19    support a significant reduction based on her age.

20          As I said, this crime was premeditated and planned

21    over weeks.  It was not an isolated, solitary incident.  And

22    her significant involvement in the planning and execution of

23    the murder, and the conspiracies, all would undermine any

24    mitigating value from an analysis of the *Miller* factors here.

25          So for the reasons that the Government has stated,

24

1    as well as the other reasons set forth in 3553(a), and the

2    case in *Miller*, the Government is recommending a sentence of

3    25 years.  Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Scotti.

5              I'll now hear from the defense, Mr. Taylor.

6              MR. TAYLOR:  Thank you, Your Honor.

7              This is a very difficult case.  A child was

8    murdered.  And the agony that her  family is going through is

9    palpable.

10             Lidia was herself a child when the murder occurred.

11   She was 16 years old, about ten days shy of her 17th birthday,

12   when Jasson Medrano-Molina was murdered.

13             As you know, Your Honor, the guidelines in this case

14   are 292 to 365 months.

15             Probation has recommended below guidelines sentence,

16   of 22 years, in light of the substantial mitigation that has

17   been presented in this case.  And the Government is seeking a

18   guideline sentence of 25 years, 300 months, so it's at the

19   relatively low end of the guidelines range.

20             Your Honor, this is a difficult case because this is

21   not a median offense that would warrant a guidelines sentence.

22             On the other side of the ledger from the family's

23   agony is what Lidia has gone through.

24             THE INTERPRETER:  Sorry.  Could you repeat that,

25   please.

25

1          MR. TAYLOR:  On the other side of the ledger from

2     the agony that the family has experienced is what Lidia has

3     gone through.

4               Your Honor sentenced Mr. Sorto Portillo to 30 years.

5               A lower sentence for Ms. DelCarmen-Rodriguez would

6     be warranted in the absence of any mitigation for the simple

7     reason that she was not the shooter.  One could only

8     hypothesize about whether she could commit that act herself,

9     which is not to minimize her role in the offense.

10              She has taken, she has accepted full responsibility,

11     she waived indictment, and she stood in this courtroom and she

12     stated that she committed a crime, but her role was different

13     from Mr. Sorto Portillo's.

14              Now, the Government in their sentencing submission

15     in connection with Mr. Sorto Portillo, that's docket number

16     19-CR-423, ECF No. 79, on page 4, the Government says of Mr.

17     Porto Sortillo, quote, "the defendant recruited DelCarmen-

18     Rodriguez and Co-Conspirator No. 1 to participate in this

19     conspiracy, and then with their assistance ambushed Medrano-

20     Molina and two other young men." end quote.

21              There, the Government makes clear that Mr. Sorto

22     Portillo who has already been sentenced was the prime mover in

23     this terrible, terrible crime.

24              So for that reason, just the difference in the role,

25     Ms. DelCarmen-Rodriguez should get a sentence at the bottom of

26

1    the guidelines without any consideration of mitigation.  But

2    then there is that other side of the ledger.

3            Your Honor, I'm going to go through a few of the

4    issues that we've raised in our sentencing submissions.  I'm

5    going to address the *Miller* case briefly.  And I'm going to

6    then talk about why the sentence that we have requested the

7    Court impose, ten years, is appropriate in this case.

8            The mitigation in this case is extraordinary.  I'm

9    going to start with one piece of information that's closest to

10   the crime.

11           On August 1st, 2019, six days before Jasson Medrano-

12   Molina was murdered, Lidia attempted suicide.  She ate a bunch

13   of pills.  She cut herself.  She was taken to Cohen's

14   Childrens Hospital in an ambulance and she was kept there

15   under observation for a few days.  She survived that attempt

16   on her life.  But what was -- what was it that drove her to

17   that?

18           It's difficult for me going back through Ms.

19   DelCarmen-Rodriguez's life story to bring this all up again in

20   front of her, because she's had to go through it numerous

21   times with different professionals, me, with Dr. Goldsmith,

22   Ms. Steinberg.  It's very difficult for her, so I'm not going

23   to go through this in all the horrific detail that's set forth

24   in our sentencing submissions.

25           I'm just going to try to spend a moment for us to

27

1    imagine that it was like for a child between the age of 4 and

2    12 to experience what Lidia experienced day after day.  She

3    was a defenseless child.  She was raped over and over,

4    physically abused, treated like an unwanted member of the

5    household by her own family.  She lived in rags.  The money

6    that her mother sent to her from America was taken by her

7    father and his other family for their own use.  They treated

8    her like an animal.

9         She has physical scars on her back from the

10   whippings that she received.  And she has in side of her the

11   trauma indelible.  It affects the neural pathways of the

12   developing brain to undergo that kind of trauma.

13        Now, the trauma did not end in El Salvador.

14        The Government said just now that they do not

15   dispute that Lidia was raped again in 2015.  June 18, 2015, an

16   abandoned house in Central Islip, by seven men, some of whom

17   went to her school.  She underwent that trauma as well.

18        Now, this is not an attempt, as the Government put

19   it, to, quote, "explain away her crime."  Rather, as required

20   under Section 3553, the Court needs to consider both sides of

21   the ledger, both the offense and the history and character of

22   the defendant.

23        Now, the Government has focused rightly on the

24   choices that Ms. DelCarmen-Rodriguez made.  Those choices were

25   conditioned by the complex PTSD that she suffers from.

1          And when she arrived in America at the age of 12 she

2     did not find herself in a situation where everything that

3     she'd experienced previously was in the past and now she could

4     start a new life.  On the contrary, as the Government points

5     out in their sentencing memo for Jose Sorto Portillo at page

6     5, MS-13 was, quote, "terrorizing communities in Long Island."

7          And as the Government puts it, MS-13's pervasive

8     presence in those communities, quote, "make it impossible for

9     law-abiding citizens, especially those with teenage children,

10    to live a normal life."

11         That applies equally to Lidia.  She came to this

12    country at the age of 12.  As she noted to Dr. Goldsmith, when

13    she got to Long Island, she could tell from the way the boys

14    walked, certain boys walked, that they were gang members.

15    That was traumatizing for her.

16         The Government faults her for not staying clear of

17    those people.  But it was not possible to stay clear.  As the

18    Government puts it themselves, they make it impossible for

19    law-abiding citizens, especially those with teenage children,

20    to live a normal life.  Lidia was no exception to that.

21         Now, in our mitigation report, we set forth the data

22    that shows that women who have been subjected, I'm sorry,

23    strike that, girls who have been subjected to sexual abuse and

24    rape are massively more likely to become affiliated with gangs

25    than women who have not.  Two and a half times more likely for

1    a woman, for a girl, who's been subjected to sexual violence

2    become a member of a gang than a girl from the same community

3    who was not.  That's data.  And it's in our mitigation report.

4               Why do the girls then join the gang?  People who

5    have studied this say that often they say it's because they

6    feel safe.  And that's the case here.

7               Lidia was raped in June of 2018.  Shortly thereafter

8    she met and started a relationship with Mr. Sorto Portillo.

9    Yes, she knew that he was a member of MS-13, and she felt

10   safer around him because she knew that then nobody would do to

11   her again what had happened to her on June 18th, 2018.

12              Now, the girls may say they feel safe, but they're

13   not really safe.

14              The Government wants to create an equivalence

15   between Mr. Sorto Portillo and the decisions he made and the

16   decisions that Lidia made, but they're not at all equivalent,

17   because we're kidding ourselves if we think that the girls in

18   that group have control over what's happening.  They get used

19   by the boys.  They get told what to do.  And if they don't do

20   that, there are consequences.

21              When Lidia came to the U.S. and -- she found that

22   she was not in a safe environment that specifically applied to

23   young women.  In September of 2016, two girls who were not

24   much older than Lidia were brutally murdered in Brentwood.

25   Lidia knew about that.  Everybody knew about that.  The

30

1    President of the United States came here, held a press

2    conference, and called Salvadorians animals.  Everyone knew

3    what was going on in that community.

4            And that's when Lidia starts to cut herself and to

5    use cannabis.  She's very young.  The cannabis use, the

6    complex PTSD, those have a direct impact on her decision

7    making.

8            Now, the Government has focused, made a big deal

9    about, how, as they put it, there was nothing impulsive or

10   impetuous in Lidia's behavior.  And the reason they do so is

11   because this touches on the factors set forth in *Alabama v.*

12   *Miller*.

13           Now, let's be clear, the tests in that case -- the

14   Government says it's a four-part test, I've seen it described

15   elsewhere as a five-part test -- does not apply in this case.

16   That's for cases for where a court has to decide whether a

17   juvenile offender should be sentenced to life without parole.

18   That's not on the table here.

19           The reason we brought up *Miller* in our sentencing

20   submissions is because the Supreme Court has said that

21   children are constitutionally different from adults when it

22   comes to sentencing because of their immaturity, because of

23   their lack of autonomy and other factors.  And that's

24   completely applicable here.

25           Now, the Government has taken some of the language

1  concerning juvenile impulsiveness, impetuosity, from the

2  *Miller* case to argue that because Lidia's offense involved

3  premeditation.  It was not impetuous and, therefore, not

4  characteristic of juvenile behavior.  In essence, in the

5  Government's view, premeditation negates the diminished

6  culpability attendant to youth.

7        Your Honor, this is a rhetorical strategy.  It is

8  not a fair assessment of the science behind the Supreme

9  Court's decision in *Miller* or the proceeding cases *Graham* and

10  *Roper*.  They've held that children are constitutionally

11  different because they're not fully mature and they're,

12  therefore, not as responsible for their decision making.

13        Now, even when a juvenile defendant offender engages

14  in some form of premeditation, their decision-making process

15  is still affected by their inability to accurately assess

16  risks and consequences that were identified by the Court in

17  *Miller* as being the hallmarks of youth.

18        As the Supreme Court put it, children, quote, "lack

19  the ability to extricate themselves from horrific, crime-

20  producing settings," end quote.  That's at 567 U.S. at 471.

21        Now, here, Lidia's chronological immaturity was

22  compounded by the history of trauma and complex PTSD that

23  we've been through.

24        The point that I'm trying to make here is that the

25  developmental deficits associated with Lidia's immaturity and

1    complex PTSD conditioned her decision making at every step

2    leading up to Mr. Medrano-Molina's murder.  She lacked the

3    ability to extricate herself from the offense that she

4    committed.

5          Now, the Government is very upset by a sentence in

6    Ms. Steinberg's report stating that Lidia let slip that the

7    two targets, John Doe No. 1 and Jasson, were gang members.

8    Perhaps one could say blurted or, as in a lot of the

9    submissions including the Government's own sentencing

10   submission, informed.

11         Now, whatever word, verb, that you apply to this,

12   there's nothing at all inconsistent with what we have

13   described and the facts in this case.  The Government has not

14   pointed out any fact that blurting out that these individuals

15   are gang members is inconsistent with.

16         Sure, one should understand, under those

17   circumstances, that informing a gang member that someone

18   belongs to a rival gang is going to result in terrible

19   consequences for that person, but this is the whole point of

20   *Miller*, is that juveniles are less able to sort through those

21   consequences.  And once you get something like this started,

22   there's no turning back.

23         Now, look, Lidia did not turn back.  We're not

24   denying responsibility.  Lidia has accepted it from the

25   beginning.  She waived indictment.  She pleaded guilty.  But

1    that doesn't change what happened.

2         Lidia could not find an off ramp.  She tried to

3    commit suicide a week before the offense.  That is so

4    illuminating about where her mental state was at the time that

5    she could not figure out how to get out of this mess.  Her

6    fantasies, and that's what they were, she talked to Dr.

7    Goldsmith about some part of hoping that she got shot that

8    night.  This is a fantasy.  It's a teenage fantasy.  It's the

9    fantasy of someone who is suffering from complex PTSD, and

10   it's not at all inconsistent with the facts.

11        As Lidia told the police, she knew that Mr. Sorto

12   Portillo carried a gun.  And, again, we're kidding ourselves

13   if we think that MS-13 members don't regularly carry guns and

14   that someone who is closely associated with the gang is not

15   fully aware of that fact.

16        There's nothing at all inconsistent with the facts

17   of this case and, which we are in complete agreement, whatever

18   language we use, she informed the gang members.  Then, as the

19   Government put it, Mr. Sorto Portillo recruited her and

20   another co-conspirator to participate in the conspiracy.  Ms.

21   DelCarmen-Rodriguez assisted them materially all along the way

22   resulting in Mr. Medrano-Molina's death.  We take full

23   responsibility for that.

24        I want to talk about a couple of other mitigating

25   factors that are important for the Court to understand.

34

1    Lidia went through very, very difficult conditions

2    of incarceration during the pandemic.  She was still a child.

3    She was at the Essex Juvenile Facility.  And the people who

4    work there seem very nice, but because of the disease that was

5    going around, she was locked down in her cell more than 23

6    hours a day.  And, in part, this had to do with the fact that

7    there was a mix of boys and girls in the facility.

8    And the boys, being considered a more dangerous

9    group, were given more ability to go around in the facility,

10    which meant that the girls would always have to be separated

11    from them or kept confined to their cells.

12    And these girls, to have any kind of human contact,

13    would sing to one another underneath the doors of their cells,

14    popular songs, just so they could feel some kind of

15    connection.

16    When I first met Ms. DelCarmen-Rodriguez, it was

17    over Zoom.  Even her lawyer could not get into the facility.

18    She had almost no human contact.  For someone who's been

19    through he trauma that Ms. DelCarmen-Rodriguez has been

20    through, that was incredibly difficult.

21    Incredibly, in spite of all that, she completed her

22    high school degree under those circumstances working by

23    herself on a tablet.  She got good grades.  She dropped out

24    after freshman year.  She completed high school while she was

25    in jail.

1          The other mitigating factor is that Ms. DelCarmen-

2     Rodriguez is going to be returned to El Salvador after she

3     completes her sentence.  Again, it's almost unimaginable how

4     difficult that's going to be for her.  This is a punishment

5     that is almost impossible to apprehend given what she

6     experienced in El Salvador.  And she hasn't been there since

7     she was 12.  And it makes me feel unbelievably terrible to

8     wonder what is going to happen to her when she does return.

9          Now, finally, I want to talk about how much Lidia

10    has changed.

11         I met her in 2020.  I was her second attorney.  And,

12    as I said, it was during the pandemic.  And our first meeting

13    was over Zoom.  It was difficult to communicate with Lidia.

14    Not just because of the technological challenges, but because

15    she barely spoke any English, and she was completely within

16    her shell.  She did not want to speak to me.

17         It's difficult to express how much she has changed

18    since that time.  Her English is basically flawless.  She's

19    read a novel by Gabriel Garcia Marquez in English.  Says she

20    prefers it to the Spanish version.  This is a very intelligent

21    person.  And she's also opened up.

22         Now, it's not at all surprising when she was

23    interacting with Dr. Goldsmith that there were things that she

24    didn't tell him.  With all due respect to my predecessor as

25    counsel, Dr. Goldsmith is a fantastic psychiatrist, but the

36

1    difficulty is that he's a man.  It was very hard for Lidia to

2    open up to him.  I've watched this myself because I was

3    involved in some of these meetings.  It was terrible.

4            And Ms. Steinberg was able to connect with Lidia.

5    And we can see the kind of person that she is.  Not evil.

6    Someone whether is deeply traumatized, who is remorseful, who

7    wants to do good in the world.  And so I've seen this

8    incredible change in Lidia.  I've seen the incredible change

9    in Lidia.

10            Now, clearly Your Honor is going to give and has to

11   give Ms. DelCarmen-Rodriguez a very substantial sentence.

12            We believe that ten years is appropriate under the

13   circumstances, that it might be difficult for someone who only

14   knows about the crime to understand why such a sentence would

15   be appropriate.  But here, given everything that Lidia has

16   been through, how this affected her decision making and made

17   those decisions less culpable, a ten-year sentence is

18   appropriate.

19            Thank you, Your Honor.

20            THE COURT:  Thank you, Mr. Taylor.

21            Ms. DelCarmen-Rodriguez, you also have the right to

22   speak today at your sentencing.  You can remain seated.

23   Obviously, I've received your letter, and I've read your

24   letter, but you can also speak today.  You can remain seated

25   and say anything you wish to say before you're sentenced.

37

1          MR. TAYLOR:  Your Honor, prior to the hearing, Lidia

2    told me that she did want to tell Jasson's family that she's

3    very sorry, but she also did not want to upset them by

4    addressing them directly, so she's not going to make any

5    statement today.

6          THE COURT:  All right.  I'm going to take a short

7    recess.  I want to give -- we've been going for quite a while,

8    I just want to give the interpreter a break.  We'll take a

9    ten-minute break and then I'll impose the sentence.

10        (Recess taken from 12:27 p.m. to 12:42 p.m.)

11         THE COURT:  Okay.  I've been advised, Mr. Scotti,

12   that you want to be heard on something.

13         MR. SCOTTI:  Yes, Your Honor.  I just wanted to

14   briefly address some of the --

15         THE COURT:  Very briefly.

16         MR. SCOTTI:  Very briefly, Your Honor.

17         And really it has to do with, first and foremost,

18   the role here, because Mr. Taylor did want to demonstrate a

19   significant difference in roles here between Sorto Portillo

20   and the defendant, and that's just not consistent with the

21   evidence.

22         The victim is dead today because of this defendant.

23   She is the one who reported what he told her to the defendant.

24   It was Sorto Portillo afterwards who arranged what would

25   happen with the defendant being an integral part of how the

1   victim would be killed.  But, also, it was the fact that the

2   defendant not only lured out the victim, but it was also John

3   Doe No. 1, that was the first conspiracy, and that was another

4   person that the defendant identified a possible rival.

5        And on the night of the murder of the victim, the

6   defendant was actively trying to lure out John Doe 2, so now,

7   John Doe 1, so not just one person would be killed, but two

8   would be killed.

9        And the other thing here is this notion that there

10  was no turning back.  The defendant had weeks to consider what

11  was -- what was going on and what she was doing and what she

12  was being involved in.  She had every opportunity to turn her

13  back on it and she didn't.  The reason was she was fully

14  committed to it.  She was not hanging out with these people

15  out of fear.  She was not afraid of the gang.  She wanted to

16  be part of it.  And she was fully committed to what they were

17  doing.  She instigated these crimes.  And after it, Your

18  Honor, her conduct after is very, very telling.

19       And also the idea that -- and the defendant uses our

20  own words from the letter sort of against us here in saying

21  that it's not possible to avoid the MS-13.

22       What we're referring to is that it's not possible

23  for people who live in the communities where the MS-13 exists

24  to avoid the terror and the fear that the MS-13 causes.

25       It's very possible to avoid joining the MS-13 gang.

1    It's very possible to avoid participating in murders like

2    this.

3            There are countless immigrants from Central America

4    who come to this country, who come to Long Island, who want a

5    better life, who lead law-abiding lives, and don't associate

6    themselves with the MS-13 gang like the defendant did, who

7    don't participate in conspiracies to murder and murder like

8    this defendant did.

9            So those are just two points that I wanted --

10           THE COURT:  All right.

11           MR. SCOTTI:  -- address, Your Honor.  And I do

12   appreciate the Court allowing me to do so.

13           THE COURT:  All right.  Thank you.

14           I'm now going to state the sentence I impose.  I'll

15   give the attorneys a final opportunity to make any legal

16   objection before the sentence is actually imposed.

17           In imposing the sentence today, I have carefully

18   considered, as I'm required to, the factors set forth by

19   Congress in Section 3553(a).

20           They include, among others, I'm considering all of

21   them -- I'm not, you know, going to read them word for word,

22   but I'm summarizing -- they include the nature and the

23   circumstance of the offense, the history and characteristics

24   of Ms. DelCarmen-Rodriguez, the need for the sentence imposed

25   to reflect the seriousness of the offense, to promote respect

40

1    for the law, to provide a just punishment for the offense, to

2    afford adequate deterrence to criminal conduct, to protect the

3    public from further crimes by a defendant.

4              I've also considered the Advisory Sentencing

5    Guidelines issued by the Sentencing Commission, which we have

6    discussed, including the applicable range and the applicable

7    policy statements issued by the Sentencing Commission.

8              I've also considered the need to avoid unwarranted

9    disparities among similarly situated defendants.  Obviously I

10   sentenced Mr. Sorto Portillo for this crime as well as

11   numerous other defendants, including juveniles for similar

12   crimes.  I'm aware of other sentences by other judges as well,

13   so I've considered that factor in detail.

14             And let me just check with the Government the

15   restitution factor.  The restitution's not being sought, is

16   that correct?

17             MR. SCOTTI:  That's correct, Your Honor.

18             THE COURT:  All right.

19             I've also considered, there's been reference both in

20   the letters and today -- and Mr. Taylor is correct, the *Miller*

21   decision dealt with mandatory life sentences -- but certainly

22   we all appreciate that those factors apply here as well when

23   you have a defendant who committed the crime as a juvenile, so

24   I am considering the defendant's chronological age and

25   characteristics, including immaturity, impetuosity, and

1    failure to appreciate risks and consequences.

2            I have considered also the family home and

3    environment that surrounded her both in El Salvador and here.

4            I've considered the circumstances of the homicide

5    offense, including the extent of her participation in the

6    conduct and the way that familial and peer pressures may have

7    affected her conduct.

8            I've considered the possibility of rehabilitation as

9    it relates to issues such as future dangerousness and other

10   3553(a) factors, more of the *Tapia* decision, which the Supreme

11   Court made clear that a sentence cannot be lengthened for

12   imprisonment.  And certainly that is not a consideration here.

13   It's a consideration in the context of the other 3553(a)

14   factors.

15           The fifth factor, which Mr. Taylor said is sometimes

16   referred to as the fifth -- five-factor test, doesn't really

17   apply here.  It's whether the age affected the ability to plea

18   bargain or assist with the attorneys, and there's no

19   indication of that here.

20           Having considered all the 3553(a) factors and the

21   *Miller* factors, in my discretion, I intend to impose a

22   sentence of 22 years of imprisonment.  And I'm going to state

23   the reasons for that sentence.

24           I've given the sentence a lot of thought.  People

25   can disagree with the number, but certainly I've done my best

1    to balance all the factors in what is an extremely difficult

2    case.  All sentencings are difficult, but this one obviously

3    presents a lot of factors that the Court needs to consider.

4         I start with the nature of the crime and Ms.

5    DelCarmen-Rodriguez's role in that crime and the harm caused

6    by that crime, because I don't think it can be overemphasized,

7    as we heard from the victim's family, Mr. Medrano-Molina lost

8    his life as a result of Ms. DelCarmen-Rodriguez's conduct.

9         She was not the shooter and certainly that is a

10   factor.  She's not as culpable as the shooter, but as the

11   Government noted, and is clear from her guilty plea, from the

12   pre-sentence report, she brought this issue to the gang.

13        She understood, based upon her experiences in El

14   Salvador, and her knowledge of the gang, what that would mean

15   if you told the gang that individuals were part of a rival

16   gang, and that's exactly what happened.

17        And I appreciate the Government noting, and I noted

18   it when Mr. Taylor was speaking, that the Government -- the

19   recruiting of Ms. DelCarmen-Rodriguez was recruiting her to

20   lure them, or for John Doe No. 1 unsuccessfully, and then Mr.

21   Medrano-Molina, to their death, but the recruiting did not

22   take place until Ms. DelCarmen-Rodriguez first brought this

23   issue to the gang.  She set the wheels in motion.  She

24   understood exactly what the gang's response to that was going

25   to be.

43

1          And then she lured the victim, first, again, John

2     Doe No. 1 unsuccessfully.  This involved many weeks over which

3     this conduct and plan played out.  And she knew what was going

4     to happen.

5          And as a result of that, a 15-year-old boy, who had

6     done nothing wrong, lost his life.  He was executed.  And it's

7     part of the activities of a gang that kills people for no

8     reason.  They terrorize the communities they operate in.  She

9     assisted them.

10          It's in my view that this would not have been

11     successful.  They needed someone to trick the victims into

12     going into that forest.  And she was a key -- I think the

13     Government referred to as pivotal part of that plan -- and she

14     did so willingly.

15          I'll address the *Miller* factors in a minute.

16          So those factors, to me, if those were the only

17     factors, this sentence would not just warrant a sentence at

18     the high end of the guideline range, it would be -- it should

19     be above the guideline range.

20          The guideline range for murder would be insufficient

21     to address the execution of a 15-year-old boy for no reason

22     and her role in doing that.

23          But there are other factors the Court is

24     considering.

25          Obviously, Mr. Taylor did an excellent job in

1    writing, and today, his mitigation expert of developing the

2    mitigating factors and pointing them out to the Court.  And

3    they are significant.

4              First of all, she was a juvenile at the time, almost

5    17 years old.  The Court is considering her age.  She accepted

6    responsibility.  She pled guilty.  I'm considering that as

7    well.  She did express remorse in the letter.  I'm considering

8    that as well.  The abuse that she suffered was horrific.

9              I said at the time of the transfer hearing, and I

10   just repeated again, the physical and emotional abuse by her

11   father, the way she was treated was horrific.  The sexual

12   abuse by her stepbrother was horrific.

13             And I fully accept and credit the rape that occurred

14   while she was in high school here in the United States.

15             So the Court has carefully considered that, and is

16   giving a lower sentence than I would otherwise give because of

17   that substantial abuse, which Dr. Goldsmith, who, you know,

18   testified here during the transfer hearing, that she suffered

19   significant complex, post-traumatic stress disorder from those

20   experiences.  And that's clear and it's important.

21             Her cannabis use contributed as well, because that

22   can affect brain development and function.

23             And obviously the fact that she attempted suicide

24   shortly before this murder took place is a reflection of her

25   suffering from the effects of this abuse at the time of this

1    crime.  So the Court needs to consider that because it is a

2    substantial mitigating factor.

3              There are medical issues that she has that I

4    considered as well.

5              The prison conditions, I have considered being

6    incarcerated during COVID.  You know, because of reasons Mr.

7    Taylor indicated, you know, it's not necessary indicating any

8    type of abuse by the jail, but just the conditions of

9    confinement were much worse and a sentence should reflect that

10   as well.  So the combination.

11             And, you know, there are other things Mr. Taylor

12   covered.  I'm not mentioning everything in his submission, but

13   those are the most significant ones that the Court in

14   combination has considered to determine that a 22-year

15   sentence is the appropriate one, balancing all these

16   considerations, rather than what otherwise would be a much

17   higher sentence.

18             I do want to address a couple of things with respect

19   to the *Miller* factors because I did consider those.  And

20   obviously the defense asked for a much lower sentence of ten

21   years based upon the mitigating factors, which I don't agree

22   with, and I just want to address the *Miller* factors in

23   particular.

24             This crime was -- first of all, the notion that it's

25   not possible, as Mr. Scotti pointed out, to avoid the gang,

1    even in the communities that the gang operate, I just

2    fundamentally disagree with.  It's clear that, you know,

3    juveniles who have all types of challenges and issues in their

4    lives and trauma are still able to avoid the gang and not

5    associate with the gang.

6              The Government's statement in those letters, which

7    I've seen many times, you know, over the years, is an

8    indication that individuals like Mr. Medrano-Molina, who are

9    doing nothing wrong, are victims of the random violence of the

10   MS-13 gang in the communities they operate.

11             So I reject the idea that even someone with

12   obviously horrific trauma that Ms. DelCarmen-Rodriguez

13   suffered that somehow it is inevitable that she would be

14   involved with a gang, and inevitable that she would help

15   engineer this execution.  She had a lot of choices to make

16   along the way.

17             And I do not believe there was pressure, that Mr.

18   Taylor indicated today, to commit this crime by the nature of

19   the way the gang functions.  And I have seen those situations

20   again over the years.  This was not one of them.

21             Nobody was putting pressure on her to bring to the

22   gang her belief, based upon who knows what, that Mr. Medrano-

23   Molina and the other individual were associating with a rival

24   gang.  There was no pressure to do that.  She chose to do

25   that, again, knowing what the consequences were.

1    And then over a period of weeks, by her decisions

2    and her conduct, showed that she did not care at that time

3    that these individuals were going to be executed.  She just

4    did not care.  She understood what she was doing.  Nobody was

5    putting pressure on her.  And she did not care that they would

6    be executed.

7            And, in fact, as the Government noted, was, you

8    know, when John Doe 1 wasn't available, she moved to the next

9    person.  And even when Mr. Medrano-Molina showed up with

10   another individual, she moved forward with the plot.

11           So this is not one of those high-pressured

12   situations where she made a spur-of-the-moment decision to be

13   involved in a murder.  It took place over a substantial period

14   with her eyes wide open.

15           Certainly it was influenced by her trauma and her

16   lack of judgment, but this is not a situation where issues of

17   pressure or impulsivity were at the forefront.  She had been

18   in this country for a number of years.  And she had -- her

19   mother was trying to be supportive of her, and she chose to be

20   involved in these offenses.

21           So, although I believe the *Miller* factors certainly

22   warrant a lower sentence than the Court would otherwise impose

23   if she were an adult and if she did not suffer from this

24   trauma, I do not believe that a sentence lower than the 22

25   years that I'm imposing today would properly balance the

1    factors.

2              We have to balance her trauma with the loss of a

3    life.  Mr. Medrano-Molina's life is over.

4              And we have to balance her trauma with the trauma

5    of those family members over there, who for the rest of

6    their lives will not have their son, their grandson, their

7    nephew, to share in life, and emotional and mental trauma

8    that they will experience every day for the rest of their

9    lives, has to be reflected, and I don't believe any sentence

10   lower than the 22 years I'm imposing today would properly

11   balance the mitigating factors versus those factors if I

12   were to, in my discretion, sentence anything lower than

13   that.

14             I gave significant thought to giving a higher

15   sentence, but I think this is the proper balance under the

16   circumstances.

17             I also want to address Mr. Sorto Portillo, because

18   certainly I do my best to make sure the sentence is

19   proportionate based upon culpability with respect to other

20   co-conspirators, and also just more generally with respect

21   to sentences of similarly-situated defendants.

22             And I do believe that there is sufficient distance

23   between the two sentences, the eight years.  I'm not going

24   to recap Mr. Sorto Portillo's sentence, but -- although he

25   is certainly more culpable than her, he also had his own

1    mitigating factors that led the Court to give him that

2    sentence as opposed to a significantly higher sentence.  So

3    I think that's important to note that he had his own

4    mitigating factors that were substantial as well.

5           But, in any event, I believe the other factors,

6    even if this were viewed as not for that particular factor

7    of not having sufficient distance between them, although I

8    think it is, I believe the other factors outweigh that under

9    the circumstances of this particular case.

10          So that's how I arrived at this sentence.

11          I intend to impose three years of supervised

12   release, even though it's likely, as Mr. Taylor noted, and I

13   did consider the collateral consequences as well, it's

14   likely she will be deported once she finishes serving this

15   jail time.          I'm imposing the three years of

16   supervised release in any event for two reasons.

17          One, in the event that she is not deported, who

18   knows what the immigration laws will be in the future and

19   whether or not there will be mandatory deportation or not,

20   but assuming she was able to stay in the United States, she

21   certainly should be under supervision for three years to

22   ensure she does not return to any type of criminal activity

23   or gang activity.

24          And in order to monitor her for those purposes,

25   all the special conditions are necessary.  Including not

1   associating in any way with gangs; participating in mental

2   health evaluation, if necessary, treatment, because of the

3   psychological issues that we have all agreed upon that she

4   has; the search condition's necessary because of the

5   involvement and the nature of this offense and the gang

6   activity, the involvement of a firearm; if she's removed

7   that she may not reenter the United States illegally, I'll

8   address that in a moment; she cooperate with all immigration

9   authorities if she stays in the United States.  Those are

10  certainly all necessary to monitor her once she gets out of

11  jail.

12          If she is deported, I believe this is also

13  appropriate to act as a disincentive for her to return to

14  the United States.  As Mr. Taylor noted, she's been here

15  since she was 12.  Her mother is here.

16          And this will operate as a disincentive for her to

17  come back because it would not only be a separate crime for

18  her to come back, but it would be a violation of her

19  conditions of release during this period, which can be

20  subject to even more penalties.

21          So that's why I believe it's appropriate in this

22  particular case.

23          I'm not going to impose a fine because she has no

24  money.  I'm not going to impose restitution because it's not

25  sought.  I do intend to impose the $100 special assessment.

1          I'll now hear from the lawyers, is there any legal

2    reason why the Court cannot impose that sentence?

3          Mr. Taylor?

4          MR. TAYLOR:  No, Your Honor.

5          THE COURT:  Mr. Scotti?

6          MR. SCOTTI:  No, Your Honor.

7          THE COURT:  All right.  I'll now formally impose

8    the sentence.

9          Ms. DelCarmen-Rodriguez, it is the judgment of

10   this court, in its discretion, after considering the 3553(a)

11   factors, that you be sent to the custody of the Attorney

12   General through the Bureau of Prisons to a term of

13   imprisonment of 22 years, 264 months.

14         I impose three years of supervised release to

15   follow that term of imprisonment, with the standard

16   conditions, and the mandatory conditions.

17         I do modify one of those conditions because the

18   Second Circuit has suggested that it's in appropriate to

19   delegate to the Probation Department its assessment in terms

20   of notifying any third parties of her conviction, that that

21   should be made by the Court, so I'll modify that standard

22   condition to reflect it's the Court's decision.

23         I also impose the special conditions as follows:

24         One, you shall not associate in person, through

25   mail, or electronic mail, the internet, social media,

1    telephone, or any other means with any individual with an

2    affiliation to any organized crime groups, gangs or other --

3    any other criminal enterprise.  Nor shall you frequent any

4    establishment or other locale where these groups may meet

5    pursuant, but not limited to a prohibition list provided by

6    the Probation Department.  You shall not access any website

7    that is affiliated with radical extreme groups, terrorist

8    organizations, organized crime groups, gangs, or any other

9    criminal enterprise.

10        Two, you shall participate in a mental health

11    evaluation and, if deemed necessary, mental health treatment

12    program approved by the U.S. Probation Office.

13        You shall contribute to the cost of services

14    rendered for any psychotropic medications as prescribed via

15    co-payment or full payment in an amount to be determined by

16    the U.S. Probation Department based upon your ability to pay

17    and/or the ability of third-party treatment.

18        Third, you shall submit your person, property,

19    house, residence, vehicle, papers, computers, as defined in

20    18 U.S.C. Section 1030(e)(1), other electronic

21    communications or data storage devices or media or office,

22    to a search conducted by a United States Probation Officer.

23        Failure to submit to a search may be grounds for

24    revocation of release.  You shall warn any other occupants

25    that the premises may be subject to searches pursuant to

1    this condition.

2            An officer may conduct a search pursuant to this

3    condition only when suspicion exists that you violated a

4    condition of your supervision and that the areas to be

5    searched contain evidence of this violation.  Any search

6    must be conducted at a reasonable time and in a reasonable

7    manner.

8            If removed, you may not reenter the United States

9    illegally, and you shall cooperate with and abide by all

10   instructions of the immigration authorities.

11           I would just note with respect to the computers

12   that both respective association and search condition, the

13   use of computers and text messages by these gangs make those

14   types of mining or search or ensuring that no association

15   based upon the internet or social media necessary.

16           I impose a $100 mandatory special assessment.  I

17   impose no fine and no restitution.

18           Ms. DelCarmen-Rodriguez, I need to advise you of

19   our statutory right to appeal.  To the extent you have not

20   waived your right to appeal in your plea agreement with the

21   Government, you have a right to appeal your conviction and

22   sentence.

23           If you're unable to pay the cost of appeal, you

24   may apply for leave to appeal in forma pauperis.  If you

25   cannot afford an attorney, one will be appointed to

54

1      represent you on appeal.  The notice of appeal must be filed

2      within 14 days of judgment of conviction.

3             Does the Government move to dismiss the underlying

4      juvenile information?

5             MR. SCOTTI:  Yes, Your Honor.

6             THE COURT:  The underlying juvenile information is

7      dismissed.

8             All right.  Are there any other issues either side

9      needs to raise?

10            Anything from the defense?

11            MR. TAYLOR:  Yes, Your Honor.

12            We would ask that the Court recommend, in the

13     judgment concerning Ms. DelCarmen-Rodriguez's designation,

14     first, that she not be designated to a facility in the State

15     of Texas.  The reason for that is that one of her abusers is

16     believed to live there.

17            And second, we ask that the Court recommend to the

18     Bureau of Prisons that Ms. DelCarmen-Rodriguez be designated

19     to a facility with a female integrated treatment program, or

20     FIT Program, is available.

21            Thank you.

22            THE COURT:  All right.  I'll put those, both of

23     those recommendations in the judgment of conviction.

24            Doe the Government have anything else for today?

25            MR. SCOTTI:  Nothing further from the Government.

1    Thank you, Your Honor.

2            THE COURT:  All right.  Thank you.

3        (Proceedings concluded at 1:07 p.m.)

4

5

6            I, CHRISTINE FIORE, court-approved transcriber and

7    certified electronic reporter and transcriber, certify that

8    the foregoing is a correct transcript from the official

9    electronic sound recording of the proceedings in the above-

10   entitled matter.

11

12   *Christine Fiore*

13   _____        December 28, 2023

14      Christine Fiore, CERT

15

16

17

18

19

20

21

22

23

24

25